# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT of PENNSYLVANIA

| | |
|---|---|
| ROBERT HYAMS, derivatively on behalf of EVOQUA WATER TECHNOLOGIES CORP., | |
| Plaintiff, | Case No.:     20-1122 |
| vs. | |
| RONALD C. KEATING, BENEDICT J. STAS, MARTIN LAMB, JUDD A. GREGG, HARBHAJAN BHAMBRI, GARY A. CAPPELINE, BRIAN HOESTEREY, VINAY KUMAR, PETER M. WILVER, AEA INVESTORS LP, AEA EWT HOLDINGS LP, AEA EWT HOLDINGS GP LLC, AEA INVESTORS FUND V LP, AEA INVESTORS PARTICIPANT FUND V LP, AEA INVESTORS QP PARTICIPANT FUND V LP, AEA INVESTORS FUND V-A LP, AEA INVESTORS FUND V-B LP, AEA INVESTORS PF V LLC, AEA INVESTORS LP, AEA INVESTORS PARTNERS V LP, and AEA MANAGEMENT (CAYMAN) LTD., | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| EVOQUA WATER TECHNOLOGIES CORP., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Robert Hyams ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Evoqua Water Technologies Corporation ("Evoqua" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Ronald C. Keating, Benedict J. Stas, Martin Lamb, Judd A. Gregg, Harbhajan Bhambri, Gary A.

Cappeline, Brian Hoesterey, Vinay Kumar, and Peter M. Wilver (collectively, the "Individual Defendants"), AEA Investors LP ("AEA") and its affiliates[1] (the "AEA Affiliates" and, together with AEA, the "AEA Defendants") (collectively, the "Defendants") for breaches of their fiduciary duties as directors, officers and/or controlling stockholders of Evoqua, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 20(a) the Securities Exchange Act of 1934 (the "Exchange Act"), and also for aiding and abetting breaches of fiduciary duties against the AEA Defendants and against the Individual Defendants for violations of Section 10(b) of the Exchange Act. As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United

---

[1]  The AEA Affiliates include the following entities:

    i.  AEA EWT Holdings LP ("AEA EWT Holdings"), which is the beneficial record holder of Evoqua common stock for AEA and its affiliates.

    ii.  AEA EWT Holdings GP LLC ("AEA EWT Holdings GP"), which is the general partner of AEA EWT Holdings.

    iii.  AEA Investors Fund V LP, which is the managing member of AEA EWT Holdings GP.

    iv.  AEA Investors Participant Fund V LP, AEA Investors QP Participant Fund V LP, AEA Investors Fund V-A LP, and AEA Investors Fund V-B LP, which are the other members of AEA EWT Holdings GP and are limited partners of AEA EWT Holdings;

    v.  AEA Investors PF V LLC, which is the general partner of AEA Investors Participant Fund V LP and AEA Investors QP Participant Fund V LP;

    vi.  AEA Investors LP, which is the sole member of AEA Investors PF V LLC;

    vii.  AEA Investors Partners V LP, which is the general partner of each of AEA Investors Fund V LP, AEA Investors Fund V-A LP, and AEA Investors Fund V-B LP; and

    viii.  AEA Management (Cayman) Ltd., which is the general partner of AEA Investors Partners V LP.

States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Evoqua, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a shareholder derivative action that seeks to remedy wrongdoing committed by Evoqua's directors, officers, and controlling stockholders, between November 1, 2017 and October 30, 2018, both dates inclusive (the "Relevant Period").

2.       Evoqua purports to be a worldwide leading provider of mission critical water treatment solutions, offering services, systems, and technologies to support customers' full water lifecycle needs. Evoqua provides products and services such as wastewater treatment, water disinfection for pools, aquatic applications, and water purification to various industries, municipalities, waterparks, and other commercial or public entities. With over 200,000 installations worldwide, the Company holds leading positions in the industrial, commercial, and municipal water treatment markets in North America.

3.       Evoqua was incorporated in 2013 and is headquartered in Pittsburgh, Pennsylvania. Evoqua's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "AQUA."

4.       In November 2017, through the Company's controlling shareholder, AEA, Evoqua went public through an initial public offering ("IPO"). AEA aided the process of Evoqua going public by installing top executives that it chose to bring the Company public.

5.      In March 2018, Evoqua initiated a secondary public offering ("SPO" and, together with the IPO, the "Offerings").  Through the Offerings, Defendants caused over $880 million worth of Evoqua stock to be sold to investors based on offering materials that contained false and misleading statements.  Out of the total $880 million, the Individual Defendants and the AEA Defendants collectively gained over $500 million in proceeds from the sale of their own Evoqua shares.

6.      However, during the two years leading up to the IPO, between the IPO and the SPO, and continuing throughout the Relevant Period, the Company implemented a number of undisclosed business practices that materially weakened Evoqua, while investors (including Plaintiff) were entirely unaware due to incomplete and insufficient disclosures the Defendants made and/or caused to be made.

7.      The Individual Defendants and AEA specifically caused Evoqua to implement a program whereby the Company slashed 600 of its employees, particularly its most experienced and highly compensated sales personnel, in order to substantially decrease its operating costs and expenses.  Evoqua's revenue is largely derived from supplying products and services for large-scale capital projects; as such, the Company's capacity to foster its relationships with its larger commercial, industrial, and municipal customers (and prospective customers) was always crucially important its business. Accordingly, maintaining a highly skilled and experienced sales staff was critical to establishing, preserving, and growing those relationships.  By implementing massive cuts to its sales and integration personnel, and particularly removing the Company's most senior, experienced and highly compensated sales personnel (and replacing them, if at all, with vastly less qualified and cheaper salespeople), the Defendants foreseeably risked Evoqua's post-IPO and SPO

prospects and growth to glean short-term savings and to artificially inflate its stock price at the time of the IPO and SPO.

8.      Additionally, Evoqua acquired more than a half-dozen companies in the roughly 20-month period leading up to the IPO, because it had not succeeded in growing organically.  Yet, in stark contrast to the story that Defendants were telling investors, the Company failed to successfully integrate those acquisitions.  The Company's problematic integration process was further impaired by the Individual Defendants' decision to cause the Company to terminate qualified managers and administrative personnel who had the most experience in integrating new acquisitions (in addition to culling the Company's most experienced sales professionals). While investors were misleadingly told about the purported success of Evoqua's business model to grow through integration, the Defendants were removing key integration personnel and refusing to allocate the requisite funds and resources to accomplish those touted goals.

9.      Lastly, in a desperate attempt to mask the Company's stalled growth and improbable prospects, Evoqua utilized increasingly aggressive maneuvers to artificially enhance its reported revenue, including through fraudulent accounting manipulations in blatant violation of Generally Accepted Accounting Principles ("GAAP"), as the date of the IPO approached and thereafter. Evoqua specifically preemptively and/or otherwise inappropriately recognized revenue on, *inter alia*:  shipments of products that were subject to broad rights of return; products where no final agreement to purchase had been reached, including those shipped to third-party storage vendors to sit and wait to potentially, but not certainly, be purchased ("inventory parking"), products prior to being shipped; and products that the Company had yet to even manufacture. Evoqua also prematurely recognized revenue from service contracts and improperly deferred payments of expenses, which further inflated its reported revenues.  Moreover, concurrently with

its recognition of revenue on non-GAAP "sales," as the IPO and SPO approached, Evoqua's executive management further concealed the weakness in the Company's business by offering steeper and steeper discounts and extended payment terms to customers, all in a secret effort to "stuff the channels" and "pull forward" sales, thereby maximizing reported short-term revenue at the expense of future agreements and revenue in the long term.  In addition to the misrepresentations and omissions in public filings that this practice caused, the practice was in and of itself its own violation of law and an independent wrongdoing.

10.     Indeed, Defendants touted—in the IPO and SPO Documents (defined below) and their other public statements during the Relevant Period—the Company's growth-through-acquisitions strategy as, *inter alia*, enabling it "to accelerate our growth in our current addressable market," and stressed that Evoqua's supposedly "experienced team dedicated to mergers and acquisitions" had "successfully completed eight technology-enhancing and geography-expanding acquisitions since April 2016."  Regarding the stability and strength of Evoqua's essential sales force, the IPO and SPO Documents represented that Evoqua had "energized [its] workforce and reduced employee turnover," and would "continue to invest in [its] sales force" to "maintain and enhance our customer relationships."  The IPO and SPO Documents and subsequent reports on Evoqua's quarterly financial performance, sought to further project the Company's financial strength and progress.

11.     During this time, the Defendants also failed to disclose the truth about Evoqua's business and operations. As further detailed below, the IPO and SPO Documents, as well as other statements made and/or caused to be made by the Individual Defendants identified herein, were materially false, misleading and incomplete in violation of the federal securities laws and Defendants' disclosure obligations.

12. Throughout the Relevant Period, the Individual Defendants personally made and/or caused the Company to make a series of materially false and misleading statements and omissions regarding the Company's business, operations, prospects, accounting and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia,* that the Company: (i) had privately terminated, and was continuing to privately terminate, its most experienced sales and integration personnel; (ii) was unable to effectively assimilate its prior acquisitions and was experiencing significant and expensive problems with its integration attempts; (iii) failed to maintain adequate internal controls, including by improperly inflating revenue and deflating expenses in violation of GAAP; (iv) violations of GAAP rules, along with Evoqua's "channel stuffing" activities artificially inflated its reported financial performance and disguised the Company's actual stalled growth; and (v) prioritized short term cost savings by, among other measures, terminating its most experienced sales and integration personnel, foreseeably placing Evoqua's long-term post-IPO and post-SPO prospects at risk.

13. A little less than a year following the IPO, the truth about Evoqua's business and operations began to emerge. In fact, just months after the IPO, Evoqua made a partial corrective disclosure on May 8, 2018, when it announced that its earnings guidance needed to be decreased. On August 7, 2018, the Company made another revelation, when it announced earnings that were well below Wall Street consensus estimates. Evoqua's stock price declined a a result of these partial corrective disclosures. However, the full truth , including Evoqua's inflated revenues and the Company's ongoing acquisition integration problems remained concealed.

14.     On October 30, 2018, the truth fully emerged. On that date, the Company announced significantly reduced revenues and further lowered guidance, attributed to "acquisition integration issues," "supply chain disruptions," and "an extended delay on a large aquatics project." The Company further revealed management's determination that Evoqua's business required an entire re-structuring. These revelations, which came not even a year following Evoqua's IPO, shocked the investing public.

15.     On this news, Evoqua's stock price plunged $4.78 per share, or 34.64%, on heavy trading volume, from closing at $13.80 per share on October 29, 2018 to close at $9.02 per share on October 30, 2018. In a single day, $544 million of Evoqua's market capitalization was wiped out. Concerned, securities analysts reported that the Company's disclosures revealed that the Company's "business is clearly riskier than initially thought," and brought the Company's officers' (including certain of the Individual Defendants') "credibility into question."

16.     As a result of the foregoing, the Company's public statements were materially false and misleading during the Relevant Period. The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for, *inter alia*, breaching their fiduciary duties.

17.     Furthermore, during the Relevant Period, Defendants, who dominated and controlled the Board of Directors (the "Board") and management of Evoqua, breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations and omissions, and four of the Individual Defendants engaged in insider sales, netting proceeds of over $12.2 million. Defendants also breached their fiduciary duties by conspiring with the AEA Defendants in public offerings of

shares in the IPO and SPO, at artificially inflated prices, which caused Evoqua to become liable to outside investors for violations of federal securities laws.

18.     At the same time, Defendants caused Evoqua to lose thousands of dollars repurchasing its own stock at artificially inflated prices. The Company repurchased approximately 18,000 shares of the Company's stock at inflated prices between October 1, 2017 and September 30, 2018 for approximately $230,000.[2]  Given that the Company's stock was actually only worth $9.02 per share, the price at which it was trading on October 30, 2018, the Company overpaid approximately $67,640 in total.  These repurchases were disclosed in the Company's Form 10-K that was filed with the SEC on December 11, 2018 (the "2018 10-K") and was signed or authorized to be signed by all of the Individual Defendants.

19.     The Individual Defendants further failed to maintain internal controls.

20.     In light of the Individual Defendants' misconduct, which has subjected the Company, several of its officers and directors, and AEA and the AEA Affiliates to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"),[3] the need to undertake internal investigations, the need to implement adequate internal controls, the

---

[2]     Upon information and belief, these repurchases were made during the Relevant Period.

[3]     On March 30, 2020, the Honorable Alison J. Nathan of U.S. District Court for the Southern District of New York granted-in-part and denied-in-part defendants' motion to dismiss the amended class action complaint in the Securities Class Action.  *See City of Omaha Police & Fire Ret. Syst. V. Evoqua Water Tech. Corp.*, 2020 WL 1529371, at *33-40 (S.D.N.Y. 2020).  Although the Court dismissed the Securities Class Action plaintiffs' claims under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, the Court upheld the Securities Class Action plaintiffs' claims under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. § 77a *et seq*. ("Securities Act") because defendants misrepresented the Company's sales force practices and the actualized risks Evoqua faced as a result, misrepresented the Company's integration efforts, including significant challenges facing the Company in light of firing key staff, and reported inflated financial results through "various accounting tricks."  *Id.*

losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants and the AEA Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company has had and will have to expend many millions of dollars.

21.     In light of the breaches of fiduciary duties by the Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of Evoqua's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j, 78t, and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5)) promulgated thereunder, and raise federal questions pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District,

or he is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

26.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

27.     Venue is proper in this District because Evoqua and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

28.     Plaintiff is a current shareholder of Evoqua.  Plaintiff has continuously held Evoqua common stock at all relevant times.

### Nominal Defendant Evoqua

29.     Defendant Evoqua is incorporated in Delaware, and its stock trades on the NYSE under the ticker symbol "AQUA."  The Company's corporate headquarters are located at 210 Sixth Avenue, Pittsburgh, Pennsylvania 15222.  Evoqua purportedly provides mission-critical water-treatment solutions, offering services, systems, and technologies to support all of its customers' water lifecycle needs.  Evoqua derives approximately 85% of its revenues from its businesses in North America and has established a significant presence in the market for water-treatment providers in North America.

30.     The Company completed its IPO on November 7, 2017. Following the IPO, Evoqua served its customers through three segments: Industrial, Municipal, and Products.  Evoqua's Industrial segment provided tailored solutions in collaboration with its customers supported by life-cycle services, such as on-demand water, build-own operate, and response service alternatives

to improve operational reliability, performance and environmental compliance. The Municipal segment delivered solutions, equipment and services to engineering firms, original equipment manufacturers and municipalities to treat wastewater and purify drinking water. The Products segment purportedly provided highly differentiated and scalable range of products and technologies specified by global water treatment designers, original equipment manufacturers, engineering firms and integrators. The Company reorganized its business in October 2018 into a two-segment structure focused on integrated solutions and product technologies.

**Defendant Keating**

31.    Defendant Ronald C. Keating has served as the Chief Executive Officer ("CEO"), and President, and as a Director for Evoqua since December 2014.

32.    The Company's Schedule 14A filed with the SEC on January 6, 2020 (the "2020 Proxy Statement") provides the following about Defendant Keating:

> Ron C. Keating has served on our Board and as our President and Chief Executive Officer since December 2014. Prior to joining Evoqua, Mr. Keating was President and Chief Executive Officer of Contech Engineered Solutions, an infrastructure site solutions provider, from 2007 to 2014. Before heading Contech, Mr. Keating served as President of the Metalworking Solutions and Services Group of Kennametal Inc. (NYSE: KMT), a supplier of tooling and industrial materials. He had also held previous roles at Kennametal as the Vice President and General Manager of the Energy, Mining and Construction Group and for the Electronics Products Group from 2001 to 2007. Mr. Keating started his career at Ingersoll-Rand Inc. in 1992 where he held various roles of increasing responsibility until departing in 2001. Mr. Keating currently serves on the board of directors and the Compensation and Corporate Governance committees of US Ecology Inc. (Nasdaq: ECOL). Mr. Keating also serves on the board of trustees for the Manufacturers Alliance for Productivity and Innovation, and the board of directors of the Allegheny Conference. Mr. Keating received an M.B.A. from the Kellogg School of Management at Northwestern University and received a B.S. in Industrial Distribution from Texas A&M University.

33.    Defendant Keating knowingly or recklessly made and/or caused the Company to make numerous false and misleading statements in the Company's press releases, earnings conference calls, and SEC filings, throughout the Relevant Period as detailed below. In particular,

Defendant Keating signed or authorized the signing of the IPO Registration Statement, the 2017 10-K, the SPO Registration Statement, SPO Prospectus (defined below), and certain of the Company's quarterly reports filed on Form 10-Q.

34. During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Keating made only one purchase of company stock on November 6, 2017: a purchase of 3,000 shares at a price of $18.00, for a total value of $54,000. Defendant Keating did not make any further purchases during the Relevant Period and instead sold more than $7.2 million worth of company stock. On March 19, 2018, Defendant Keating sold 294,149 shares at price of $21.29 for a total value of $6,262,432. Two days later, on March 21, 2018, Defendant Keating sold 44,122 shares at a price of $21.29 for a total value of $939,357. Defendant Keating's next purchase of Evoqua stock would not be until November 30, 2018, one month after the release of the fourth quarter financial results for the 2018 fiscal year. Defendant Keating purchased 24,236 shares at a price of $8.99, a price less than half of that at which he sold shares in March 2018, for a total value of $217,978. Thus, in total, before the fraud was exposed, he sold 338,271 Company shares on inside information, for which he received approximately $7.2 million.

35. Defendant Keating has received and continues to receive lavish compensation for his roles within the Company, most recently receiving $12,283,463 in compensation during the 2018 fiscal year and $3,291,385 during the 2019 fiscal year.

36. Notably, the Company's 2020 Proxy Statement provides that Defendant Keating "is not independent because of his position as an executive officer."

**Defendant Stas**

37. Defendant Stas has served as the Company's Executive Vice President, Chief Financial Officer ("CFO"), and Treasurer since March 2015.

- 13 -

38.     The Company's 2020 Proxy Statement states the following about Defendant Stas:

Benedict J. Stas has served as our Executive Vice President, Chief Financial Officer and Treasurer since March 2015. Prior to joining Evoqua, Mr. Stas held a variety of senior financial and business roles at Kennametal Inc. (NYSE: KMT), a supplier of tooling and industrial materials, from 1997 to 2015, including roles as Vice President Finance of Business Groups from 2010 to 2013 and as Vice President of Manufacturing for the Industrial Segment from 2014 to 2015. While at Kennametal Inc., Mr. Stas also served as Chief Financial Officer of the Industrial Business Group, Chief Financial Officer of Kennametal Europe GmbH, Director of Global Manufacturing Finance, Controller of Metalworking Americas, and Senior Financial Analyst for Global Financial Sales and Marketing from 1997 to 1999. Prior to joining Kennametal Inc., Mr. Stas worked for DuPont Co., as a Plant Controller, Accountant and Team Leader, from 1991 to 1997. Mr. Stas received an M.B.A. from Duquesne University and received a B.S. in Business Administration from Drexel University.

39.     Like Defendant Keating, Defendant Stas was responsible for knowingly or recklessly making numerous false and misleading statements in the Company's press releases, earnings conference calls, and SEC filings throughout the Relevant Period as detailed below.

40.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Stas made the following sales of Company stock (and made no purchases of Company stock). On March 19, 2018, Defendant Stas sold 86,950 shares at a price of $21.29 for a total value of $1,851,165. On March 21, Defendant Stas sold 13,043 shares at a price of $21.29 for a total value of $277,685. Defendant Stas' next purchase of company stock was not until November 30, 2019, one month after the release of the fourth quarter financial reports, at which time he purchased 8,000 shares at a price of $9.02, less than half the price at which he sold stock in March 2018, for a total value of $72,184. Thus, in total, before the fraud was exposed, he sold 99,993 Company shares on inside information, for which he received more than $2.1 million.

41. Defendant Stas has received and continues to receive lavish compensation for his roles within the Company, most recently receiving $5,340,578 in compensation during the 2018 fiscal year and $1,172,238 during the 2019 fiscal year.

**Defendant Lamb**

42. Defendant Lamb has served as the Chairman of the Company's Board of Directors since March 2014.

43. The Company's 2020 Proxy Statement states the following about Defendant Lamb:

Martin J. Lamb joined our Board in, and has served as Chairman of our Board since, March 2014. Mr. Lamb, a retired engineering/industrial services executive, spent 33 years at IMI plc (LON: IMI), an engineering company which designs, manufactures and services highly engineered products that control the precise movement of fluids, including as its Chief Executive Officer for the last 13 years until his retirement in 2013. In June 2014, Mr. Lamb joined Rotork plc (LON: ROR), a global designer and manufacturer of industrial valve actuators, control systems and accessories, as its Non-Executive Chairman, and led the organization as its Interim Chief Executive Officer from July 2017 through March 2018. Mr. Lamb also served as a Non-Executive Director on the boards of Mercia Technologies PLC, an investment group, from 2015 through September 2017; Severn Trent plc (LON: SVT), from 2008 to 2016; and Spectris plc (LON: SXS), from 1999 to 2006. Mr. Lamb is a member of the European Advisory Board of AEA. Mr. Lamb received an M.B.A. from Cranfield Business School and a B.S. in Mechanical Engineering from Imperial College.

44. Defendant Lamb signed or authorized the signing of the IPO Registration Statement, the 2017 10-K, and the SPO Registration Statement.

45. During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Lamb made the following sales of Company stock (and made no purchases of Company stock). On March 19, 2018, Defendant Lamb sold 93,765 shares at a price of $21.29 for a total value of $1,996,256. On March 21, Defendant Lamb sold 14,065 shares at a price of $21.29 for a total value of $299,443. Thus, in total, before the fraud was exposed, he sold 107,830 Company shares on inside information, for which he received approximately $2.2 million.

- 15 -

46.     Defendant Lamb has received and continues to receive lavish compensation for his roles within the Company.  During fiscal year 2018, Defendant Lamb received $206,119 in total compensation, and during fiscal year 2019, Defendant Lamb received $241,504 in total compensation.  Defendant Lamb also holds 3,968 restricted stock units, which fully vested on February 28, 2019.

**Defendant Gregg**

47.     Defendant Gregg has served on the Company's Board of Directors since March 2014.

48.     The Company's 2020 Proxy Statement states the following about Defendant Gregg:

Senator Judd A. Gregg has served on our Board since March 2014.  Senator Gregg, a retired United States Senator and state governor, has spent over three decades in public office, most recently serving as the U.S. Senator from the State of New Hampshire from January 1993 until January 2011.  During his tenure in the Senate, Senator Gregg served on key Senate committees, including Budget, Appropriations, Government Affairs, Banking, Housing and Urban Affairs, Commerce, Science and Transportation, Foreign Relations and Health, Education, Labor and Pensions.  He was the Chairman and Ranking Member of the Health, Education, Labor and Pensions Committee and the Chairman and Ranking Member of the Senate Budget Committee, as well as chairman of various sub-committees. Senator Gregg was a chief negotiator of the Emergency Economic Stabilization Act of 2008; the lead sponsor of the Deficit Reduction Act of 2005; and, with the late Senator Ted Kennedy, co-authored the No Child Left Behind Act of 2001.  In March 2010, Senator Gregg was appointed to President Obama's bipartisan National Commission on Fiscal Responsibility and Reform.  Before joining the U.S. Senate, Senator Gregg was Governor of New Hampshire from 1989 to 1993 and a U.S. Representative from 1981 to 1989.  Senator Gregg was named as Dartmouth College's first distinguished fellow and teaches at the college and its graduate schools. Senator Gregg serves on the board of directors and audit committee of Honeywell International Inc. (NYSE: HON) and was a member of the board of directors of Intercontinental Exchange, Inc. (NYSE: ICE) from 2011 to 2013.  Senator Gregg received an A.B. from Columbia University and a J.D. and an L.L.M. from Boston University and A.B. from Columbia University.

49.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Gregg made the following sales of Company stock (and made no purchases of Company stock). On March 19,

2018, Defendant Gregg sold 24,531 shares at a price of $21.29 for a total value of $522,264.  On

March 21, Defendant Gregg sold 3,680 shares at a price of $21.29 for a total value of $78,347.

Thus, in total, before the fraud was exposed, he sold 28,211 Company shares on inside information,

for which he received approximately $600,611.

50.     Defendant Gregg has received and continues to receive lavish compensation for his

roles within the Company.  During fiscal year 2018, Defendant Gregg received $158,244 in total

compensation and during fiscal year 2019, Defendant Gregg received $179,004 in total

compensation.  Defendant Gregg also holds 3,968 restricted stock units, which fully vested on

February 28, 2019.

**Defendant Bhambri**

51.     Defendant Bhambri has served on the Company's Board of Directors since March

2014.

52.     The Company's 2020 Proxy Statement states the following about Defendant

Bhambri:

> Harbhajan (Nick) Bhambri has served on our Board since March 2014.  A retired
> chemicals/manufacturing executive, Mr. Bhambri has been President of Louis York
> Capital, a private investment firm focusing on the industrial, chemical, energy,
> manufacturing, distribution and services markets, since 2015.  Mr. Bhambri spent
> over two decades of his career at MECS Inc., a Monsanto subsidiary and process
> technology provider to the sulfuric acid industry serving the refining, metallurgical,
> uranium and fertilizer industries, including as its President and Chief Executive
> Officer from 2007 until its acquisition by DuPont in 2012.  After retiring from
> MECS Inc., Mr. Bhambri served as a director of MPG Performance Group (NYSE:
> MPG) until its acquisition by American Axle & Manufacturing Inc. in 2017.  Mr.
> Bhambri also is a past president of the Washington University Olin Business School
> Executive MBA alumni board and member of the Olin National Council at
> Washington University in St. Louis.  Mr. Bhambri received a B.S. in Mechanical
> Engineering and an M.B.A., both from Washington University in St. Louis.

53. Defendant Bhambri was, at all relevant times, a director of the Company. Defendant Bhambri signed or authorized the signing of the IPO Registration Statement, the 2017 10-K, and the SPO Registration Statement.

54. Defendant Bhambri has received and continues to receive lavish compensation for his roles within the Company. During fiscal year 2018, Defendant Bhambri received $164,994 in total compensation, and during fiscal year 2019, Defendant Bhambri received $185,004 in total compensation. Defendant Bhambri also holds 179,807 options, which are fully vested, and holds 3,968 restricted stock units, which fully vested on February 28, 2019.

**Defendant Cappeline**

55. Defendant Cappeline has served on the Company's Board of Directors since January 2014.

56. The Company's 2020 Proxy Statement states the following about Defendant Cappeline:

> Gary A. Cappeline has served on our Board since the inception of our Company's operations in January 2014. Mr. Cappeline, a retired manufacturing/chemicals industry executive and merchant/investment banking principal, was an Operating Partner of AEA from 2007 until December 2018, where he advised on acquisition opportunities and operational matters at portfolio companies. Prior to joining AEA, Mr. Cappeline was a President and Chief Operating Officer of Ashland Inc. (NYSE: ASH), a manufacturer of specialty chemicals, Valvoline motor oil and water treatment solutions, and a diversified plastics and chemicals distributor with a division specializing in water treatment solutions, to which he returned in 2002 after service as Group VP of Engelhard Corporation from 1997 to 1999 and as President, Chemicals of Honeywell International (NYSE: HON) from 1998 to 2000. He also served as chemical industry partner at Bear Stearns Merchant Bank from 2000 to 2001. Mr. Cappeline currently serves on the board of directors and nominating and corporate governance committee (as chairman) and compensation committee of Innophos Holdings, Inc. (Nasdaq: IPHS), an international producer of specialty ingredient solutions that deliver versatile benefits for the food, health, nutrition and industrial markets, and on the board of directors and audit committee of Swanson Industries, Inc., a provider of hydraulic cylinder manufacturing, remanufacturing and repair services for the mining and mobile industries. He previously served as a board and executive committee member of the American Chemistry Council, a chemical industry trade association, a director of Unifrax

Corporation, a manufacturer of high temperature insulation products, chairman and a director of Houghton International Inc., a manufacturer of metal working fluids, a director of Shoes for Crews, LLC, a manufacturer of slip resistant footwear, a director of RelaDyne Inc., a distributor of lubricants and fuels, and a director of Tampico Beverages Inc., a manufacturer of fruit drinks. Mr. Cappeline received B.S. and M.S. degrees in Chemical Engineering from the City College of New York and attended Harvard Business School's Executive Management Program in 1993.

57.     Defendant Cappeline signed or authorized the signing of the IPO Registration Statement, the 2017 10-K, and the SPO Registration Statement.

58.     Defendant Cappeline has received and continues to receive lavish compensation for his roles within the Company.  During fiscal year 2019, Defendant Cappeline received $168,233 in total compensation.

59.     Although, as of January 2020, the Board purportedly determined that Defendant Cappeline was an independent Director because the Company's "Board considered that Mr. Cappeline, a non-employee director, retired from AEA effective December 31, 2018," prior to that date and throughout the Relevant Period, the Board had determined that Defendant Cappeline was not an independent Director.

**Defendant Hoesterey**

60.     Defendant Hoesterey has served on the Company's Board of Directors since January 2014.

61.     The Company's 2020 Proxy Statement states the following about Defendant Hoesterey:

Brian R. Hoesterey has served on our Board since the inception of our Company's operations in January 2014.  Mr. Hoesterey is President of AEA, which he joined in 1999, where he focuses on investments in the specialty chemicals and value-added industrial products sectors.  Prior to joining AEA, Mr. Hoesterey was with BT Capital Partners, the private equity investment vehicle of Bankers Trust from 1998 to 1999.  Mr. Hoesterey has also previously worked for McKinsey & Co. from 1994 to 1997 and the investment banking division of Morgan Stanley from 1989 to 1993.  Mr. Hoesterey is currently a director of GMS, Inc. (NYSE: GMS), Swanson Industries, Inc., VC GB Holdings, Excelitas Technologies Corp. and Springs

- 19 -

Window Fashions. He also serves on the board of trustees for Madison Square Boys and Girls Club and on the board of directors of the Grammy Museum Foundation. Mr. Hoesterey previously served on the boards of directors of At Home Group Inc. (NYSE: HOME), CPG International Inc., Houghton International Inc., SRS, Henry Company, Unifrax Corporation, Pregis Holding II Corporation and Noveon. Mr. Hoesterey currently serves on the Oversight Committee for Patagonia Sur, a for-profit venture that invests in, protects and enhances scenically remarkable and ecologically valuable properties in Chilean Patagonia. Mr. Hoesterey received an M.B.A. with honors from Harvard Business School and B.B.A. in Accounting, summa cum laude, from Texas Christian University.

62.     Defendant Hoesterey signed or authorized the signing of the IPO Registration Statement, the 2017 10-K, and the SPO Registration Statement.

63.     Evoqua's 2020 Proxy Statement provides that Defendant Hoesterey is "not independent because of [his] affiliation with AEA" as President of AEA.

**Defendant Kumar**

64.     Defendant Kumar has served on the Company's Board of Directors since January 2014.

65.     The Company's 2020 Proxy Statement states the following about Defendant Kumar:

Vinay Kumar has served on our Board since the inception of our Company's operations in January 2014. He is a Partner with AEA, which he joined in 2004, where he has focused on investments in the value-added industrial, specialty chemical and business services sectors. Mr. Kumar is currently a director of Excelitas Technologies Corp. Mr. Kumar was previously on the board of Dematic and involved in AEA's investments in CPG International Inc., Cogent Healthcare and Pregis Holdings II Corporation. Prior to joining AEA, Mr. Kumar was a strategy consultant with Bain & Company in San Francisco and London from 2001 to 2004. Mr. Kumar received an A.B. in History and Science with honors from Harvard University.

66.     Defendant Kumar signed or authorized the signing of the IPO Registration Statement, the 2017 10-K, and the SPO Registration Statement.

67.     Evoqua's 2020 Proxy Statement provides that Defendant Kumar is "not independent because of [his] affiliation with AEA" as Partner of AEA.

**Defendant Wilver**

68.     Defendant Wilver has served on the Company's Board of Directors since January 2018.

69.     The Company's 2020 Proxy Statement states the following about Defendant Wilver:

> Peter M. Wilver joined our Board in January 2018 and was recommended to our Board by a third-party leadership consulting firm that was engaged by our Board to complete an extensive director search.  Mr. Wilver, a retired technology manufacturing and services executive and certified public accountant, joined Thermo Electron Corp. in 2000 and was appointed as its Chief Financial Officer in 2004.  Following the creation of Thermo Fisher Scientific Inc., a leading provider of laboratory products and services (NYSE: TMO) ("Thermo Fisher"), in 2006 through the merger of Thermo Electron Corp. and Fisher Scientific International Inc., Mr. Wilver continued as Chief Financial Officer from 2006 to 2015 and as Executive Vice President and Chief Administrative Officer from 2015 until retirement in March 2017.  Before joining Thermo Fisher, Mr. Wilver worked for General Electric, Grimes Aerospace Company and Honeywell International (formerly AlliedSignal), where he most recently served as Vice President and Chief Financial Officer of the electronic materials business. Mr. Wilver currently serves on the board of directors and audit and compensation committees of CIRCOR International, Inc. (NYSE: CIR).  Mr. Wilver previously served on the board of directors and audit and human resources committees of Tenet Healthcare Corporation (NYSE: THC).  Mr. Wilver received a B.S.B.A. in Accounting from The Ohio State University.

70.     Defendant Wilver signed or authorized the signing of the SPO Registration Statement.

71.     Defendant Wilver has received and continues to receive lavish compensation for his role within the Company.  During fiscal year 2018, Defendant Wilver received $170,494 in total compensation, and during fiscal year 2019, Defendant Wilver received $195,004 in total compensation.  Defendant Wilver also holds 3,968 restricted stock units, which fully vested on February 28, 2019.

**The AEA Defendants**

72.     AEA, a private investment firm with its principal offices in New York, New York, managed billions of dollars of capital for its investors at the time of the IPO and SPO.  AEA primarily leverages buyouts and private equity investments in mid-market manufacturing, service, distribution, specialty chemicals, consumer products and business services companies.   AEA and its affiliates owned approximately 58.5% of Evoqua common stock prior to the IPO.  During the IPO, the AEA Defendants sold 15,385,048 shares of Evoqua common stock for proceeds of approximately $260,315,000, retaining approximately 40.6% of the Company's common stock and about 70.7% of the voting power of the Company's outstanding common stock.  In the SPO, the AEA Defendants sold 10,953,746 shares of Evoqua common stock for approximately $233,150,000, retaining approximately 30.9% of the Company's common stock and about 52.5% of the voting power of the Company's outstanding common stock.  The AEA Defendants'  AEA influenced and controlled, directly or indirectly, the Company's major business decisions through their controlling interest in Evoqua.

73.     Indeed, Evoqua's SEC filings identified AEA as its "Sponsor" and represented that Evoqua was a "controlled company" under AEA.  This was due in large part to AEA's holding and control of more than 50% of the voting power for the election of Evoqua's directors.  Evoqua's SEC filings likewise stated that, "because AEA controls a significant percentage of our common stock, it may influence all major corporate decisions."  Because of the pervasive control that AEA exerted over Evoqua, the Company's SEC filings also stated that "the interests of AEA and its affiliates, including certain of our directors, may conflict with your interests as an owner of our common stock and those of the Company."

74.     The AEA Affiliates, listed above (*see* p. 1 n.1 above), also owned and sold Evoqua shares in the IPO and SPO and/or managed or controlled AEA-affiliated entities that owned and

sold such shares. The IPO and SPO Documents provided that each of AEA and the AEA Defendants, other than AEA EWT Holdings, may be deemed to share beneficial ownership of the shares of Evoqua common stock held of record by AEA EWT Holdings.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

75. By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of Evoqua and because of their ability to control the business and corporate affairs of Evoqua, the Individual Defendants owed Evoqua and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Evoqua in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Evoqua and its shareholders in order to benefit all shareholders equally.

76. Each controlling shareholder, director and officer of the Company owes to Evoqua and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

77. The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors and/or officers of Evoqua, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

78. To discharge their duties, the controlling shareholder, officers and directors of Evoqua were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

79. Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the

management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Evoqua, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

80. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Defendants, including AEA as a controlling shareholder, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

81. To discharge their duties, the officers and directors of Evoqua were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Evoqua were required to, *inter alia*:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Pennsylvania, and the United States, and pursuant to Evoqua's own Code of Ethics and Business Conduct;

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Evoqua conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Evoqua and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Evoqua's operations would comply with all applicable laws and Evoqua's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

82.     Each of the Individual Defendants further owed to Evoqua and the shareholders the duty of loyalty requiring that each favor Evoqua's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

83.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Evoqua and were at all times acting within the course and scope of such agency.

84.     Because of their advisory, executive, managerial, and directorial, and controlling shareholder positions with Evoqua, each of the Individual Defendants had access to adverse, non-public information about the Company.

85.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Evoqua.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

86.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

87.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to:  (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 10(b) and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

88.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

89.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

90.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Evoqua, and was at all times acting within the course and scope of such agency.

## EVOQUA'S CODE OF ETHICS AND BUSINESS CONDUCT

91.    Pursuant to the Company's Code of Ethics and Business Conduct (the "Code of Ethics and Conduct"), the Company adopted its Code of Ethics and Conduct to "guide everything we do and reinforce our unwavering commitment to customer service."

92.    The Code of Ethics and Conduct provides, as to compliance with the Code and with laws, rules and regulations, that:

> We all have a duty to fully read and understand this Code. Each one of us is responsible for doing the right thing, and protecting the integrity of our colleagues and the Company. We must avoid even the appearance of impropriety at all times. If something does not feel right, it probably isn't right. Ask before acting. If you become aware of a situation that may violate this Code, applicable law, or any other Company policy, you have a duty to report your colleagues and the Company to report it as soon as possible. Avenues for you to report your concerns are detailed in the "Feedback and Reporting" section of the Code. Failure to comply with this Code or any other applicable law or policy may have severe consequences for you, your co-workers and the Company itself. Non-compliance can damage the Company's reputation and your reputation as well. In some cases, noncompliance may subject those involved to criminal prosecution and lawsuits. The Company will enforce this Code and all other Company policies. Non-compliance may lead to disciplinary action up to and including termination. The Company may also report applicable instances of non-compliance to government authorities.

93.    The Code of Ethics and Conduct provides, as to "Responsibility to Our Investors," that:

> Open and effective communication requires accurate and truthful reporting. This applies equally to relationships with investors, employees, customers and business partners, as well as with the public and all governmental offices. We must ensure that all financial records we create and submit, including time cards, expense reports, project cost estimates, purchase orders, invoices, payroll records and inventory records are complete, accurate, timely and free from misleading statements. All transactions affecting the Company, directly or indirectly, must be recorded properly, accurately and timely and be documented in the Company's books and records in accordance with the Company's policies and procedures, U.S. Generally Accepted Accounting Principles and the rules and regulations of the federal and state securities laws. Misrepresentation of any nature may lead to civil or criminal liability for you and the Company. Misrepresentations may take the form of omissions and inaccuracies, as well as organizing information in a way that is intended to mislead or misinform the recipient. We must never authorize or condone the use of any "off-book" accounting, side letters containing terms that are

inconsistent with a contract, unrecorded bank accounts, "slush funds," or any other device that could be utilized to distort records or reports of the Company's true operating results and financial condition.

94.     The Code of Ethics and Conduct provides, as to "Communicating with the Public,"

that:

> The Company is committed to providing fair disclosure of information about the Company and complying with the legal and regulatory requirements related to the disclosure of material Company information.  It is the Company's policy to maintain an active and open public dialogue with its shareholders and potential investors.  In general, only the Company's spokespersons are authorized to speak with the investment community and the media.  Other than the Company's spokesperson, no employee, director or officer should discuss material non-public information outside of the Company.  Employees, officers and directors should still communicate with customers, suppliers and other business partners during the normal course of business.  If you believe you may need to disclose material, non-public or sensitive information you should contact the Legal department to determine if a non-disclosure agreement is needed.  All requests for information from securities analysts, stockholders, media or the general public should be referred to one of the official Company spokespersons.  Without the express approval of the CEO or one of the designated company spokespersons, you are not authorized to speak on behalf of the Company or to respond to specific inquiries from the investment community or the media.

95.     The Code of Ethics and Conduct provides, as to reporting and compliance

procedures, that:

> If you observe or suspect any such activity, you must report it to the Compliance Helpline, the Ethics & Compliance Department or any other reporting outlet mentioned in this Code.  You should feel free to report any suspected violation of this Code or other law or policy without fear of your employment being adversely affected.  The Company strictly prohibits acts of retaliation against any person for reporting a possible violation in good faith.

96.     In violation of the Code of Ethics and Conduct, the Individual Defendants

conducted little, if any, oversight of the Company's engagement in the Individual Defendants'

scheme to issue materially false and misleading statements to the public and to facilitate and

disguise the Individual Defendants' violations of law, including violations of Section 10(b) and

20(a) of the Exchange Act, and breaches of their fiduciary and other duties.

- 29 -

## THE SECURITIES CLASS ACTION

97.     On April 3, 2019, the City of Omaha Police and Fire Retirement System and Louisiana Sheriffs' Pension & Relief Fund, on behalf of themselves and all others similarly situated, filed the complaint in the Securities Class Action against AEA, its affiliates, several of Evoqua's officers and directors, including several of the defendants named herein and Kenneth Rodi (Executive Vice President, Products Segment President at Evoqua), Anthony Webster (Executive Vice President, Chief Human Resource Officer at Evoqua), and the Company's underwriters for its public offerings, alleging violations of both the Exchange Act and the Securities Act (the "Securities Class Action Complaint").  *See In re Evoqua Water Tech. Corp. Sec. Litig.*, No. 1:18-cv-10320-AJN (S.D.N.Y. Apr. 3, 2019).

98.     On March 30, 2020, the Honorable Alison J. Nathan of U.S. District Court for the Southern District of New York granted in part and denied in part defendants' motion to dismiss the Securities Class Action.  *See City of Omaha Police & Fire Ret. Syst. v. Evoqua Water Tech. Corp.*, 2020 WL 1529371, at *33 (S.D.N.Y. Mar. 30, 2020) (the "MTD Opinion").  Although the Court dismissed the Securities Class Action plaintiffs' Exchange Act claims,  the Court denied the motion to dismiss the Securities Class Action plaintiffs' claims under Sections 11, 12(a)(2) and 15 of the Securities Act, holding that the plaintiffs adequately pled falsity for statements made and omissions regarding Evoqua's business practices in its IPO and SPO documents filed with the SEC and certain quarterly reports that incorporated the information contained therein. *Id.*    The Securities Class Action therefore continues to be litigated based on the plaintiffs' Securities Act claims.

99.     Notably, in the MTD Opinion, the Court considered and relied upon allegations of confidential witnesses, set forth below, and also considered allegations from other proceedings

brought in state court in Rhode Island by two former Company employees in holding that plaintiffs

adequately pled falsity and materiality. The Court held:

> At this stage of litigation, the Court . . . accepts [the confidential witness] allegations as true. Defendants also argue that, according to Plaintiffs' own theory, Evoqua would not have felt the *effects* of this change in employment during this time. Plaintiffs allege that most of Evoqua's sales "involved long-term projects . . . with sales cycles often running one to five years." In their briefing, Plaintiffs thus argue that "eliminating experienced sales personnel with the best understanding of Evoqua's business and customer relationships would not be expected to have a significant impact on reported revenue in the short term (*e.g.*, revenue from projects that had already been approved and were underway)—but it had a material diverse impact on Evoqua's sales pipeline and its ability to procure the large projects and service contracts it needed to generate growth over the next one to three years." Defendants therefore claim that the CWs left too early to know what impact their change in staffing had on sales. In effect, Defendants claim that according to Plaintiffs' own theory, only employees who worked for Evoqua in the months and years *after* the policy concluded would have an adequate basis to comment on its effects.
>
> Defendants' argument, however, attacks a strawman. Taking Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, they argue that Defendants' statements were misleading because they failed to disclose the inevitable results of their changes in employment. Indeed, Plaintiffs argue that "as of the IPO the Company had already damaged its sales pipeline and its medium- to long-term sales and growth prospects." It is that damage to the pipeline—to future sales—that Plaintiffs allege was known to the Defendants at the time of these statements and therefore should have been disclosed. Many of the CWs worked on the sales staff and some occupied managerial positions. As noted, they had each had years of experience in the industry and at Evoqua. For purposes of the pleading stage, the Court concludes that the CWs were adequately situated to know how a change in staffing would impact Evoqua's future sales.

*City of Omaha Police & Fire Ret. Syst. v. Evoqua Water Tech. Corp.*, 2020 WL 1529371,

at **15-16 (citations omitted).

## DEFENDANTS' MISCONDUCT

### Background

100.    Evoqua delivers products, solutions, and services related to water quality and

consistency for industrial users, recreational facilities, and municipalities. The Company purports

to be a leading provider of water treatment solutions and maintains over 200,000 installations

worldwide. The Company was incorporated on October 7, 2013. In January 2014, AEA acquired the municipal, industrial and services water and wastewater treatment operations and assets of Siemens Water Technologies for approximately $730.6 million net of cash and renamed the acquired assets Evoqua.

101.    Before the AEA acquisition, Evoqua/Siemens Water Technologies was the result of a series of acquisitions and business combinations of already existing companies.

### *Evoqua's String of Acquisitions Leading up to the IPO*

102.    Following AEA's acquisition, the Company began executing its own strategic business combinations, which allowed Evoqua to exude the appearance of continued expansion, despite struggling to create organic growth. The Company completed eight acquisitions during the year and a half just prior to its IPO. In April 2016, the Company acquired Magneto Special Anodes B.V., a company based in the Netherlands that develops anodes for the electrochemical industry, for approximately $26.5 million. That same month, Evoqua acquired Neptune-Benson, Inc. ("Neptune-Benson"), a leading provider of water filtration and disinfection products, for approximately $284 million. Both companies were added to Evoqua's Product segment. In July 2016, Evoqua and Neptune-Benson acquired Valve and Filtration Systems, Ltd, a manufacturer of self-cleaning water filters and valves, which was also added to the Company's Product segment, for approximately $3 million. The following month, in August 2016, Evoqua and Neptune-Benson added another company to Evoqua's Product segment, with the acquisition of Delta Ultraviolet Corporation, a leading manufacturer and marketer of UV-C technology in North America for approximately $5 million. To top off its acquisitions for the year, in November 2016, Evoqua acquired Environmental Treatment Systems, Inc. ("ETS"), a leading provider of engineered solutions to the industrial wastewater market for approximately $11 million and added the

company to Evoqua's Industrial segment. The Company maintained that the acquisition complimented its legacy wastewater portfolio with exposure to a broad set of industries, including food, wood, and textiles, and allowed Evoqua to internally source certain manufacturing that had previously been outsourced. During the summer of the next year, between May 2017 and June 2017, Evoqua acquired three more companies. In May 2017 and June 2017, respectively, Evoqua added two companies to its Industrial segment, when it acquired Noble Water Technologies, Inc., a provider of high purity water equipment, systems, and services based in Dallas, Texas, for approximately $8 million, and ADI Systems Inc., a provider of anaerobic and biogas treatments, green energy recovery, and water reuse technologies, for approximately $55 million. In June 2017, Evoqua acquired and added to its Product segment Olson Irrigation Systems, a designer and producer of filters and irrigation components for the agricultural and industrial markets in California, for approximately $9 million.

103.    The string of acquisitions were part of AEA's and the Individual Defendants' scheme to entice the investing public so that they could execute a successful IPO or sale of the struggling Company and dump their own shares onto the market for artificially inflated prices. With the appearance of growth and successful integration of all Evoqua's acquisitions, Defendants were well positioned to achieve a lucrative IPO.

### *The Company Undertakes its IPO*

104.    On October 10, 2017, Evoqua filed a registration statement with the SEC on a Form S-1 (the "IPO Registration Statement") as part of its IPO.  The Company's IPO Registration Statement was declared effective by the SEC on November 1, 2017, and the Company filed a final prospectus on November 3, 2017 (the "IPO Prospectus" and together with the IPO Registration Statement, the "IPO Documents"). That day, Evoqua announced the opening of its IPO, in which it was offering 27,777,777 shares of common stock, at $18.00 per share. Of the shares being

offered, 8,333,333 shares were being sold by the Company, and 19,444,444 were being sold by certain stockholders of the Company, including certain of the Defendants. Before accounting for expenses, the IPO offering would provide the Company with approximately $140.9 million and provide the selling stockholders nearly $329 million.

105.    The Company closed its IPO on November 6, 2017, and fully completed the offering on November 7, 2017, with 31,944,443 shares of common stock having been sold by the Company and certain selling stockholders, including 4,166,666 shares sold upon the full exercise of the option to purchase additional shares granted to the underwriters of the IPO by certain stockholders of the Company. Prior to the IPO, AEA owned approximately 58.5% of the Company's outstanding common stock. AEA sold approximately 25% of its holdings of Evoqua stock in the IPO. Thus, even after the IPO, AEA still owned 40.6% of Evoqua's outstanding common stock and maintained 70.7% of the voting power of Evoqua's common stock.

106.    The IPO Documents misrepresented Evoqua as a financially successful water technology company that had effectively integrated several strategic business acquisitions and was ideally positioned for continued advancement. Specifically, the IPO Documents emphasized Evoqua's "***strategic acquisitions***" and its supposed "***experienced team dedicated to mergers and acquisitions that has successfully completed eight technology-enhancing and geography-expanding acquisitions since April 2016***."[4]  The Individual Defendants misleadingly presented that Evoqua had swiftly and effectively integrated the many companies it had acquired in a manner that added value to the Company at the time of the IPO and throughout the Relevant Period.  The IPO Documents enabled investors to believe in the prospects of the Company, as successful integration is a key consideration in analyzing the profitability and growth predictions of a

---

[4]     Unless otherwise stated herein, emphasis in quotations is added.

Company reliant on acquisitions as a growth strategy as opposed to generating organic growth, such as Evoqua.

107.    Unsurprisingly, the representations touted in the IPO Documents were reiterated by analysts reporting on the Company's prospects. Because companies in the business of acquiring other companies, such as Evoqua, tend to experience considerable employee turnover, AEA and the Individual Defendants sought to assure investors that the Company's sales force was stable and strong. To that end, the IPO Documents touted that Defendants had "realigned our organizational structure, achieved significant cost savings through operational efficiencies, and revitalized our culture, which has *energized our workforce and reduced employee turnover*."

108.    However, Evoqua experienced significant struggles with generating income from its operations and with integrating its acquisitions leading up to the IPO and thereafter.  To create the illusion that Evoqua's revenues and income were growing and stable, and to maximize the proceeds from the IPO, and soon after, the SPO, AEA and the Individual Defendants caused the Company to implement certain undisclosed cost-cutting measures and improper accounting practices.  Although they were able to artificially boost the Company's purported accomplishments in the short-term thereby, AEA's and the Individual Defendants' ruse would soon catch up with them, at the Company's expense. While these measures allowed Evoqua to report materially reduced expenses, they did so at the expense of reducing Evoqua's capacity to generate long-term growth. AEA and the Individual Defendants caused Evoqua to engage in the following cost-cutting measures:  (i) removing and replacing the Company's most experienced sales personnel with less qualified, cheaper, and inexperienced sales personnel; and (ii) drastically decreasing the personnel at the Company who were responsible for and experienced at integrating Evoqua's various acquisitions. Foreseeably, these measures diminished the Company's capacity to appropriately

integrate the eight companies that Evoqua acquired in the year and a half just before the IPO. Moreover, as detailed below, Evoqua also engaged in several forms of improper accounting for revenues and "pull[ed] forward" a large number of purported "sales" into the financial quarters just before the IPO. This left Evoqua with an undisclosed and substantial depleted sales backlog that would ultimately result in lower sales and revenue after the IPO.

### Defendants Cause Evoqua to Effectively Force Out Qualified Employees in Favor of Less Expensive, Inexperienced Sales Force and Integration Personnel

109. Approximately two years prior to the IPO, Evoqua implemented a Company-wide program to terminate, either voluntarily or involuntarily, its most experienced sales personnel, and to terminate more expensive employees in other positions, only to replace them with far less qualified individuals. These measures reduced costs to be shown on Evoqua's balance sheet, which improved Evoqua's reported financial performance (in the short-term) and ultimately enticed potential investors. The termination program, or Company-wide policy (referred to internally as the "Voluntary Separation Plan" or "VSP") included offering early retirement packages to older employees and creating nigh impossible to reach sales targets for other employees. The aggressive sales quotas allowed for 1) reduced commissions as well as 2) reduced compensation overall for staff that were pushed out because they were incapable of achieving the sales quotas.

110. As a result of this termination program, approximately 600 Company employees retired or were otherwise removed in the years just prior to the IPO. Approximately 200 employees who were retired or laid off, were done so pursuant to Evoqua's VFP. However, numerous employees were also laid off outside the bounds of that purportedly disclosed policy. The widespread replacement of qualified Company employees in favor of inexperienced cheap staff resulted in the corresponding removal of institutional knowledge and expertise from Evoqua, the

consequential decline in customer relationships, and inhibited Evoqua from generating new sales prior to the IPO and from generating revenue thereafter. Qualified and experienced personnel with the requisite skill sets were essential for developing and maintaining customers—the Company's replacement employees were ill equipped to fit the roles that had been terminated through the VSP. Notably, in the water treatment industry, large and expensive projects could already take a significant amount of time to complete, often several years., especially for the public projects Evoqua was engaged in. Thus, such projects and the customers for which those projects were for, benefitted from the relationships built through consistent sales representation. With the eradication of its experienced sales staff, the Company also lost the knowledge and institutional experience those employees provided.

111. The termination program did not just target Evoqua's experienced sales personnel, but also pushed out employees responsible for and familiar with integrating companies following acquisitions. The Company's growth plan heavily depended on its successful acquisitions, and it acquired numerous companies in connection therewith. Companies dependent on acquisition growth strategies rather than generating organic growth, like Evoqua, require those acquisitions to be successfully integrated. Acquisitions were and remain a key component of the Company's business strategy. Yet, in spite of this, the Individual Defendants cleared out those employees who could ensure Evoqua's acquisitions were successfully integrated, leaving the Company with employees who lacked the capabilities and experience necessary to adequately undertake integration responsibilities.

112. The Company's inadequacies related to its integration were not limited to its failure to obtain and retain qualified personnel. In its effort to cut costs, the Company also utilized cheap systems that were not customized to address integration specific concerns. Evoqua recognized that its ability to properly integrate the companies it acquired was an important component to its business, such that its

inability to do so threatened its growth strategy, although that was the exact route the Individual Defendants caused the Company to take, unbeknownst to investors.

113.    Notably, Evoqua's own documents filed in connection with the IPO and subsequent SPO also recognized the importance of experienced personnel, as they represented that the Company's "continued success depends on our ability to retain or attract skilled technical, engineering, sales and other key personnel, for whom competition is intense, both in retaining our existing employees and in replacing or finding additional employees." Yet, the offering materials neglected to disclose the Company's own policies and practices implemented in the two years leading up to the IPO, which dramatically reduced Evoqua's retention of its older and most experienced employees, replacing them with increasingly inexperienced personnel and consequently significantly impaired the Company's business and ability to have "continued success" from the time of the IPO, at least.

### **Defendants Cause the Company to Utilize Improper Accounting Tricks to Artificially Boost Reported Revenues and Disguise Evoqua's Actual Financial Performance in Violation of GAAP**

114.    In furtherance of their ploy to depict Evoqua as a successful and worthy investment leading up to the IPO and thereafter, the Individual Defendants utilized accounting tricks to artificially boost the Company's purported income, including by reporting anticipated income years before they were realized or realizable, in violation of GAAP. These improper accounting practices included improperly recognizing revenue on products that were conditioned upon broad return rights, products not yet agreed to be purchased, products that were parked with third party storage vendors (i.e. inventory parking), products that had not yet been shipped, and products that had not even been manufactured yet. As a result of these undisclosed improper accounting practices and GAAP violations, the Company's financial performance, growth rate, and prospects as presented to investors in the IPO Documents, and subsequent filings, were grossly exaggerated. At the same

time, the Company's inflated financial results disguised the extent of Evoqua's inability to achieve organic growth.

### *Recognizing Revenue on Product Shipments Subject to Broad Rights of Return*

115.    The Court in the Securities Class Action took judicial notice, considered and credited certain filings from state court actions brought by—or against former Evoqua employees, including an Answer to Complaint and Counterclaim filed in *Evoqua Water Tech. et al v. Schuck, et. al.*, No. C.A. PC2018-7572 (the "Schuck Filing") filed by Jennifer Schuck and a counterclaim filed by Mathew Moriarty in *Evoqua Water Tech. et al v. Moriarty, et al*, No. C.A. PC2018-7572 (the "Moriarty Filing"). *See City of Omaha Police & Fire Ret. Syst.*, 2020 WL 1529371, at **5 & 20-21.[5] Jennifer Schuck served as the Director of Supply Chain at Neptune-Benson prior to Evoqua's acquisition, and stayed thereafter as the Materials Manager of the Company's NB/Aquatics unit. Ms. Schuck asserted that senior management authorized deals with broad return rights to bolster Evoqua's financial performance.  To illustrate, Ms. Schuck described the "Myrtha Pool Order" transaction, in which the officer she reported to (Andrew Creathorn) negotiated for over $1 million worth of filters to be shipped during Evoqua's third fiscal quarter ended June 30, 2017.  In order to inflate Evoqua's revenue, as part of the deal Creathorn allegedly directed a

---

[5]    In the Securities Class Action, the U.S. District Court for the Southern District of New York held:

To be sure, Defendants may be correct that Schuck['s] allegations lack merit—but that is not at issue on a motion to dismiss.  Moreover, the finding of other courts that these individuals are not credible do not compel this Court to ignore these allegations, both because those decisions do not bind the Court and because it is inappropriate to make a credibility determination at this stage.  The Court therefore considers the allegations made in the state-court proceedings.  And taking these allegations along with those made by the CWs, the Court concludes that Plaintiffs have adequately pleaded falsity.

*City of Omaha Police & Fire Ret. Syst.*, 2020 WL 1529371, at *21.

Channel Specialist at NB/Aquatics, to allow the customer the option to return the filters at a later date. According to Ms. Schuck, this practice allowed the Company to seemingly reach its end of year revenue and sales targets—which accordingly allowed senior managers to achieve associated incentive awards and sales personnel took drastic steps to close deals valued at $3 million—including by offering substantial discounts (50%) in addition to verbal promises (outside of the contract) that the products could be returned, which protected the objective integrity of the contracts.

### *Recognizing Revenue on Products Where No Agreement to Purchase Existed and/or Inventory Parking*

116.    In further efforts to artificially inflate reported sales and revenue, Evoqua personnel recorded revenue on the shipments of product not subject to any agreement to purchase, or subject to an agreement to receive a product delivery at a later date in time. Such instances included the practice of shipping a product, knowing that the customer wanted delivery at a late date, to a third party vendor, who would agree to hold it (or "park" it) at the Company's expense, until the customer agreed to accept the delivery. Under GAAP, revenue is not properly recognized where there is no obligation on the buyer to purchase or assume any responsibility with respect to the product. According to Ms. Schuck describes, it was not uncommon for personnel at the Company to allow premature booking on an expensive projects, even where it was known that the customer did not need the products for years, solely to improve the Company's financial statements, in 2016. In one particular instance, described by Ms. Schuck, the Company arranged to pay storage fees in a manner that would protect it from scrutiny.  The Company would also offer steep discounts to the customer to convince customers to play along with the unusual shipping arrangements and pressure personnel to book last minute sales—even incorrectly—in order to boost revenue at the end of quarterly periods.

117.    As stated in the Schuck Filing:

Coinciding with the early shipment of the [Ocean Park and American Dream]
projects [in the fall of 2016], [N-B/Aquatics] Upper Management directed [its]
Logistics Manager to negotiate a rate with [a] local freight forwarder, a company
by the name of SEKO, to store filters off site at [SEKO's] facility. This was the
beginning of the practice of Upper Management directing [N-B/Aquatics'] Sales to
offer deep discounts and extended payment terms for Customers to take product
early [when actually Neptune-Benson, i.e., Evoqua] would store the filters locally
at the freight forwarders' warehouse in order to deceptively inflate revenue and
sales numbers.

118.    The Schuck Filing further illustrates, "[t]he pressure at NB[/Aquatics] to reach

targets in order to line the pockets of Upper Management and improve Evoqua's overall financials

was immense. . . . The means to increase the sales and revenue [was] not hard work and marketing,

[but] fraud and deception. As a result of this stress, the Logistics Manager resigned and NB's

Production Manager went out on sick leave, due to stress, for six months."

### *Recognizing Revenue on Unshipped Products*

119.    Just before the IPO, Evoqua also began temporarily recognizing revenue on product

"sales" before those products were even shipped. In particular, for the third quarter of 2017,

changes to the manner of revenue recognition were made to allow sales personnel to report shipped

products without requiring actual delivery. This purportedly allowed the Company a means by

which it could recognize revenue on inventory right away, as the products were deemed available

for pickup once shipped to an inventory facility.

120.    According to the Schuck Filing:

[In the] 3rd QTR of 2017, [Finance Director] Parekh applied his "creative
accounting" methods to modify the terms of delivery on all open quotes and
projects initiated by Sales . . . to default to EXW. EXW was employed as a tool to
further the business practice of billing and recognizing revenue for filters that were
not yet approved and/or manufactured and shipped, as well [to allow] Sales to
negotiate deals with Customers up to the last day of the month, to further inflate
Evoqua's financial outlook.

As a standard accounting practice, EXW is not considered a domestic delivery term

and upon [the] close of [the] 3rd QTR internal auditors challenged Parekh's contractually revised delivery terms. Upon reviewing the documentation, many of the Customers' terms of delivery on the purchase orders and/or signed quotes did not coincide with the delivery terms on the subsequent sales order. To salvage the recognized revenue on these projects, Upper management nefariously directed Sales to request [that] the Customer sign and back date a new PO and/or quote with delivery terms listed as EXW. Even though Evoqua ultimately accepted the erroneous revenue for [the] 3rd QTR 2017, the delivery term EXW was ban[n]ed from use on any future domestic projects.

### *Recognizing Revenue on Products that Were Not Manufactured or Completed*

121.     As alleged in the Schuck Filing, during the period leading up to the IPO, Evoqua's NB/Aquatics unit would ship "whatever filters were available" in order to recognize revenue "last minute" on orders received before a quarter ended, even in instances where the size of the order was incorrect or where the customer had not approved the order yet. Even where there was no filter available, Evoqua would obtain a local freight forwarder to sign off on a filter bill of lading, which functioned as the written receipt given by a carrier for accepting goods. That would thereafter be sent to Finance with a project file for billing and revenue recognition. Filters that were actually ordered would be manufactured later, and then shipped directly from Evoqua's NB/Aquatics' finishing facility in Bridgeport, CT, to the freight forwarder's off-site location.

122.     The Schuck Filing also provided two examples where the Company prematurely booked revenue on large project filter orders before the products' manufacturing had been finished or even started at the end of Evoqua's fiscal third quarter 2017. After filters for one of three large projects were completed, the Company made the shipment from its NB/A Aquatics unit, after "staging" it for pictures on three different occasions at Evoqua's facility in Rhode Island. Then, according to Ms. Schuck, personnel at the Company sent three separate bills of lading to Finance to bill the customer and quickly recognize revenue on all three projects, even though the filters for the remaining two projects were not finished. The second example, involved recognizing and processing an order as "shipped" months before the products were manufactured, the same week

certain officers of Evoqua negotiated with the customer for the sale of numerous filters for a water park operator, which the Company did not have in stock.

123.    According to the Schuck Filing, the improper revenue-recognition and related accounting manipulations involving Evoqua's and its NB/Aquatics unit's deceptive "shipments" so widespread that the Company had a "second set of books" to help manage all the fraudulent practices, which was kept on an external accounting system, that successfully disguised the impropriety of the purported shipments.

***Former Employees Cited to in the Securities Class Action Confirm the Company's Improper Revenue Recognition Practices***

124.    CWs cited to in the Securities Class Action Complaint also confirmed the improper revenue recognition practices at the Company leading up to the IPO, and continuing thereafter. CW 2 maintained that it was understood that the Company was "holding units" for customers that were not ready to take possession of the product and recalled being effectively told by Evoqua product engineers, that the Company had shipped products to customers, in spite of knowing that the products would not meet the customers' requirements.

125.    According to the Securities Class Action Complaint, CW 1 stated the Company historically brought forward revenues on long-term, multi-year service contracts with clients in order to bolster revenues in an earlier quarter, irrespective of whether the services were performed at the time of billing. However, the amount of revenue pulled forward "significantly" increased from the start of 2016, allowing Evoqua to improperly and advantageously increase its revenues at the end of quarterly periods. In some cases, according to CW 1,  pulling forward revenue in such a manner could add $50,000 to $150,000 in revenue for a current quarter, although at the expense of the following quarter. According to CWs cited in the Securities Class Action Complaint, this action also took place in September 2018, even on unshipped and/or incomplete projects or

services to bolster the Company's purported financial performance by the end of the fiscal year ended September 30, 2018, in spite of management knowing that customers would inevitably complain about being prematurely or overly billed. CWs in the Securities Class Action also confirmed that Evoqua recognized revenue after receiving a letter of intent—prior to any formal signed contract or purchase order. According to a Former U.S .Sales Manager who worked at the Company from April 2016 through August 2017 ("CW 9"), this billing practice was known to be done to increase revenues and reach Evoqua's short-term revenue projections. However, CW 9 added that this revenue would not be recognized for commission purposes until after the purchase order came in, or sometimes months after.

126. According to the Securities Class Action Complaint, the pressure to prematurely book sales at any expense continued from 2016 through 2017, and Evoqua's revenue recognition based solely on a letter of intent was not confined to Evoqua's Aquatics Group. As CWs in the Securities Class Action Complaint maintained, prior to the IPO, Evoqua's year-over-year growth in organic sales was essentially flat with the only "growth" coming from its acquisitions and "playing games with sales[]" and the Company's shift from booking revenues only after receiving a purchase order or signed contract to booking sales prematurely and/or based merely on "some form" of a "letter of intent" took place the beginning of 2016, especially for larger deals over $50,000. According to another CW in the Securities Class Action Complaint, the immense pressure from management to book revenue as soon as possible may have led others to invoice projects before their completion. A North West District Operations Manager recalled another practice where management directed the branches to "push up" repeat equipment orders and service fees that were part of continuing contracts for regular parts and services. Purported "reports" for these services were typically generated automatically according to the schedule of

service and part replacement, but during the fiscal year ended September 30, 2018, management "ran the reports" manually to "push up" the orders into earlier quarters, thereby recognizing the orders before they were scheduled.

127. Additionally, in the Moriarty Filing, Mathew Moriarty, a former Evoqua Channel Sales Director who working at the Company from April 2017 through June 2017, confirmed the common practice of preemptively recording orders that were still pending and supported by nothing more than a letter of intent, which resulted in a significant backlog. Mr. Moriarty contended that the "most all" orders in the Company's backlog "were not even approved by the customer" and the Company was effectively "cooking the books." The Moriarty Filing also supported the Company's practice of offering substantial discounts to customers for obtaining letters of intent, for projects involving long, drawn out terms. In this way, the Company was able to report "record" financial results. However, by the time of the IPO, the Company's backlog had become "heavily depleted" and its improper accounting methods would no longer sustain Evoqua's image of success.

**Defendants Cause Evoqua To Employ Additional Improper Accounting Practices to Understate Expenses in Violation of GAAP, Manipulate its Sales Backlog Report and Further Inflate its Reported Financial Results**

128. In addition to its improper revenue-recognition practices, Evoqua also delayed payment to vendors in order to temporarily improve its financials. For instance, before the IPO in the third and the fourth quarters of 2017, Evoqua's Aquatics Group withheld payments from vendors to improve its financials. Similarly, according to CW 6 in the Securities Class Action Complaint, suppliers were hesitant to work with Evoqua because the Company had delayed payments, which was a common practice in the environmental services division.

129. The NB/Aquatics group also required that any new project initiated by the Sales team, irrespective of the anticipated ship date, be recorded on the sales backlog report as scheduled to be shipped in the quarter the sale was initiated. This was done to mask the erosion of sales backlogs. Because a sales backlog is an indicator of customer demand (or lack thereof) and future stability of the Company, the Company's sales backlog was knowingly manipulated in order to hide the actual state of the Company's revenue and future growth prospects. Unsurprisingly, with sales recognized before a customer signs a contract or Evoqua issues a purchase order, many of those orders that were deemed "shipped" were cancelled. Company management refused to remove the cancelled orders from the backlog reports, further concealing Evoqua's growth prospects and future revenue.

130. Indeed, Evoqua bragged about its visibility into its future revenue as a "strength" in its documents filed in connection with its Offerings, stating in relevant part in its IPO Registration Statement:

> ***Stable, recurring flow of business with a large installed base drives superior topline visibility***. We had high visibility into over 82% of our overall revenue at the beginning of fiscal 2016. ***Approximately 58% of our revenue for fiscal 2016 was related to service, consumables and aftermarket parts that come from our repeat business and backlog***. A portion of this revenue is covered by annual and multi-year industrial contracts that had a 98% and 99% renewal rate in fiscal 2015 and 2016, respectively. We generate service and aftermarket revenue from a wide range of activities, including the regular delivery and installation of consumable ion-exchange replacement bottles across 25,000 industrial customer sites and the regular replacement of approximately 400,000 ultra-filtration membranes installed across 1,800 locations on 4-6 year cycles as of June 30, 2017. In particular, more than 80% of Industrial customers who purchased capital equipment during the two fiscal years ended September 30, 2015 and 2016 have also purchased services and/or aftermarket products over the past three years. ***Approximately 24% of our revenue for fiscal 2016 consisted of capital orders already contracted in backlog***. The remaining approximately 18% of revenue for the fiscal year ended September 30, 2016 represented book-to-bill projects, which we typically win and convert to revenue within the same fiscal year. For our capital related sales, we selectively focus on projects that we believe have the potential to produce continuing service, aftermarket and consumables sales. ***We believe the visibility and predictability we experience with our***

*revenue enhances our ability to consistently drive profitability*.

131.    According to the Schuck Filing, by the time of Ms. Schuck's departure in February 2018, approximately $2 million in cancelled sales were knowingly or recklessly included in the sales backlog report, thereby limiting Evoqua's visibility into future revenue growth with one of the main sources used to predict sales and revenue being unreliable.

132.    Evoqua's inventory was also manipulated. For example, as described by the Schuck Filing, in April 2017, Ms. Schuck identified and confirmed that approximately $300,000 worth of Lawson Aquatics inventory listed in NB/Aquatics' internal accounting system could not be physically accounted for in the Wisconsin facility where the materials were supposed to be stored. Ms. Schuck also discovered, through her investigation, that the Lawson Aquatics product line was being received in the internal accounting system twice over.  After reporting the discrepancy to senior management and requesting that the Lawson Aquatics product line be moved to a quality control inventory location and that a physical count be performed on the product line, senior management refused and ordered that the accounting be kept separate from the main system. Inventory counts were also often incorrect, according to Ms. Schuck, but when she reported the issue, she was told that this was due, in part, to  "creative accounting."

133.    The continual manipulation of the Company's sales backlog report and its inappropriate inventory tracking, made it impossible to accurately track the Company's future revenue stream and growth prospects.  Evoqua's conduct successfully masked the Company's financial state from unsuspecting investors. Also, according to CW 4 in the Securities Class Action Complaint, "easily 10%" of the data in the Company's internal sales tracking and management system was "bad," i.e.,  prospective sales included outdated deals that had already closed, stalled, been canceled, or otherwise had inaccurate statuses. Further, based on CW 4's participation in

weekly leadership meetings with sales managers and directors from each major group (Municipal, Industrial, and Product), about 50% of the "pipeline" projects that they reviewed were not listed in the internal system.  Thus, during CW 4's tenure, Evoqua's reported sales forecasts were based on "word of mouth" discussions, as opposed to data recorded in the Company's internal management system or elsewhere.  This failure of Evoqua's management rendered the Company's sales forecasts, especially for large projects, less accurate and reliable than they should have been. CW 4 also confirmed that Evoqua's accounting for inventory was "questionable at best."

134.    There were other issues with Evoqua regarding dubious practices:  the Company engaged in undisclosed "channel stuffing" practices which obscured the struggles Evoqua was experiencing with generating organic growth.  As noted above, these practices included enticing customers with substantial discounts and extended payment terms, that could even be indefinite. Yet, the Company continued to preemptively recognize revenue.  These manipulative tactics increased the year prior to the IPO, enabling Evoqua to prematurely book revenues at the end of fiscal quarters.

135.    According to the Securities Class Action Complaint, CW 3, was aware that management was more frequently authorizing uncommonly large discounts to customers to drive up sales faster,  known as "short- sells" and was also aware of the pressure coming from management to provide "steep" discounts to close deals, even at the expense of long term projects and overall growth and performance, and customer relations. This pressure only increased as the Company neared its IPO.

136.    As noted in the Schuck and Moriarty Filings and the Securities Class Action Complaint, the Company's own customers began delaying their order placements, so as to benefit

from the steep discounts they were sure to obtain if they waited until close to the end of the

quarterly period.

137.     The aforementioned misconduct diminished the Company's future revenues in

order to exaggerate the Company's short-term financial performance, as the Company continued

to quickly book orders and projects, on terms that would be unsustainable in the long term.

### *Evoqua's Secondary Offering*

138.     Evoqua filed a Form S-1 Registration Statement for its SPO on January 26, 2018.

On March 12, 2018, the final Registration Statement was filed, and declared effective by the SEC

on March 14, 2018 (the "SPO Registration Statement"). Also on March 14, 2018, Evoqua issued

a press release announcing the pricing of the SPO of 17,500,000 shares of common stock to be

sold by specified stockholders of the Company, including certain of the Individual Defendants

who were also affiliated with AEA, at $22.00 per share. On March 16, 2018, the Company filed

its prospectus for the SPO with the SEC on Form 424B4 (the "SPO Prospectus" and together with

the SPO Registration Statement, the "SPO Documents"). The SPO of 17,500,000 shares closed

on March 19, 2018, and an additional 2,625,000 shares of common stock were purchased by the

underwriters to the SPO on March 21, 2018. The Company did not sell any shares in the SPO,

and did not receive any proceeds from the sale of shares being sold by those selling stockholders.

139.     During the time of the SPO, AEA still owned about 40.6% of the Company's

outstanding stock. AEA sold 24% of its shares of Company stock during the SPO, gaining

approximately $233,150,484. Even after selling a significant portion of its Evoqua holdings, AEA

continued to own approximately 30.9% of the Company's total outstanding stock, and about

52.5% of the voting power. Certain of the Individual Defendants sold significant percentages of

their Evoqua shares in the SPO, including Defendant Keating, who sold 44% of his  shares  for

approximately $7,201,789; Defendant Stas, who sold 33% of his shares for approximately $2,128,850; Defendant Gregg, who sold 100% of his shares for approximately $600,611; and Defendant Lamb, who sold 29% of his shares for approximately $2,295,699. Other officers of Evoqua also sold significant shares in the SPO. However, as detailed below, these shares were sold at artificially inflated rates, as the investing public remained unaware of material information about Evoqua's business and prospects.

140.    AEA and the Individual Defendants were successful in their goal to artificially boost Evoqua's revenues and perceived standing before the IPO and thereafter, through concealing material information from investors, but at the expense of the Company's long-term prospects and operations. Without the requisite resources allocated for sales and integrations, the Company would not be able to seamlessly integrate with its acquired companies or secure and maintain customer relationships vital to Evoqua's continued business. Moreover, the improper accounting practices would be unable to sustain the illusion manufactured by Individual Defendants. Inevitably, their short-cut measures would begin to catch up with them in 2018—just after the Company's SPO.

141.    Still, even after the SPO, Defendants continued to make materially false or misleading statements and omissions in press releases, quarterly investor conference calls, in quarterly reports filed on Form 10-Qs with the SEC, and in investor presentations about the Company's financial results, disclosure controls, acquisitions, workforce policies and composition, and risks that the Company was subjected to, as set forth below.

**False and Misleading Statements**

*November 1, 2017 IPO Prospectus*

142.    On November 3, 2017, the Company's IPO Prospectus, dated November 1, 2017, was declared effective. The IPO Prospectus described Evoqua's purportedly successful acquisitions, and the Company's own efforts in relation to fostering the growth opportunities presented by its acquisitions, stating in relevant part"

> Our leadership developed and deployed standard operating processes under the Evoqua Growth System that repositioned the business and improved margins through operational programs and standards such as LEAN operating systems, service growth and ePro, among others. These programs, combined with our newly implemented sales methodology, Evoqua EDGE, have improved our free cash flow profile and growth prospects. ***Our management team has also expanded our operations to new target markets and geographies and has demonstrated successful acquisition and integration capabilities***. Our success depends to a significant extent on our ability to retain or attract employees in senior management, skilled technical, engineering, sales and other key personnel.
>
> *        *        *
>
> . . . As a complement to our organic growth initiatives, we view tuck-in acquisitions as a key element of our overall growth strategy . . . . ***To capitalize on these opportunities we have built an experienced team dedicated to mergers and acquisitions that has successfully completed eight technology-enhancing and geography-expanding acquisitions since April 2016, including the addition of capabilities in the attractive aquatics market*** . . . .
>
> *        *        *
>
> **Acquisitions**
>
> We believe that tuck-in acquisitions present a key opportunity within our overall growth strategy, which we will continue to evaluate strategically. . . .   To capitalize on these opportunities, we have built an experienced team dedicated to mergers and acquisitions that has successfully completed eight technology-enhancing and geography-expanding acquisitions since April 2016, with purchase prices ranging from approximately $3.3 million to approximately $283.7 million, and pre-acquisition revenues ranging from approximately $3.1 million to approximately $55.7 million. . . .   [A]lthough we may not be able to continue to identify suitable acquisition targets and implement our growth strategy, we currently have a pipeline which includes more than 60 potential targets, which

- 51 -

has been developed proactively by our team as well as informed by our customer base.

143. These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays.

144. The IPO Prospectus contained hypothetical "Risk Relating to Our Business" concerning Evoqua's acquisitions and integration attempts:

> ***Our growth strategy includes acquisitions, and we may not be able to identify suitable acquisition targets or otherwise successfully implement our growth strategy***.
>
> Acquisitions have historically been a significant part of our growth strategy, and we expect to continue to grow through acquisitions in the future. We expect to continue evaluating potential strategic acquisitions of businesses, assets and product lines. We may not be able to identify suitable candidates, negotiate appropriate or favorable acquisition terms, obtain financing that may be needed to consummate such transactions or complete proposed acquisitions. There is significant competition for acquisition and expansion opportunities in our businesses.
>
> In addition, acquisitions involve numerous risks, including (i) incurring the time and expense associated with identifying and evaluating potential acquisitions and negotiating potential transactions, resulting in management's attention being diverted from the operation of our existing business; (ii) using inaccurate estimates and judgments to evaluate credit, operations, funding, liquidity, business, management and market risks with respect to the target institution or assets; (iii) litigation relating to an acquisition, particularly in the context of a publicly held acquisition target, that could require us to incur significant expenses, result in management's attention being diverted from the operation of our existing business or delay or enjoin the transaction; (iv) failing to properly

identify an acquisition candidate's liabilities, potential liabilities or risks; and (v) not receiving required regulatory approvals or such approvals being delayed or restrictively conditional. . . . .

***We may have difficulty*** in ***operating or integrating any acquired businesses, assets or product lines profitably or in otherwise successfully implementing our growth strategy***.

The anticipated benefits from any potential acquisitions may not be achieved unless the operations of the acquired business assets or product lines are successfully integrated in an efficient, effective and timely manner. The integration of our acquisitions will require substantial attention from management and operating personnel to ensure that the acquisition does not disrupt any existing operations, or affect our customers' opinions and perceptions of our services, products or customer support.

In addition, the integration of any acquisition includes numerous risks, including an acquired business not performing to our expectations, our not integrating it appropriately, failure to realize anticipated synergies and cost savings and difficulties, inefficiencies or cost overruns in integrating and assimilating the organizational cultures, operations, technologies, data, services and products of the acquired business with ours.

The process of integrating acquired businesses, assets and product lines could cause the interruption of, or delays in, the operation of our existing business, which could have a material adverse effect on our business, financial condition, results of operations or prospects. Acquisitions also place a burden on our information, financial and operating systems and our employees and management. ***Our ability to manage our growth effectively and integrate the operations of acquired businesses, assets or product lines, will require us to continue to attract, train, motivate, manage and retain key employees and to expand our information technology, operational and financial systems. If we are unable to manage our growth effectively, we may spend time and resources on such acquisitions that do not ultimately increase our profitability or that cause loss of, or harm to, relationships with employees and customers***.

145.    These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-

term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays. Thus, the aforementioned risks described in the IPO Prospectus, were not simply hypothetical possibilities; but rather, were actualized risks that were negatively impacting the Company's business and financial results.

146.    The IPO Prospectus touted Evoqua's efforts and investments into its sales personnel and customer relationships, stating in relevant part:

> ***Grow and further penetrate our existing customer base.  We believe our strong brands, leading position in highly fragmented markets, scalable and global offerings, leading installed base and unique ability to provide complete treatment solutions will enable us to capture a larger share of our existing customers' water treatment spend while expanding with existing and new customers into adjacent end-markets and underpenetrated regions, including by investing in our sales force and cross-selling to existing customers***.  Despite having the leading market share in the North American water treatment market, our share does not exceed 25% in any single market vertical according to Amane Advisors. Furthermore, our share of any given customer's water treatment related spend is often limited to select regions, thereby creating a significant opportunity to further penetrate existing customer accounts by offering additional solutions and serving more sites, both in current and new geographic regions.  Our growth initiatives include both expanding our presence in our core North American market as well as replicating our leading position and strategies into underpenetrated global regions.  For example, through innovative technologies such as IONPURE continuous electrodeionization and Defender aquatic regenerative media filtration systems, we have expanded our positions in markets such as Asia and the Middle East.
>
> \* \* \*
>
> ***Since fiscal 2014 we have increased the proportion of customer facing employees by over 25%, developed a best-in-class training program, restructured our customer relationship management system and realigned our compensation packages***.  Sales of our products, services and solutions to some of our customers are also accomplished, in part, through the efforts of third-party sales representatives.  Through direct sales efforts, outreach and education, we plan to continue to enhance our relationships and enable further adoption of our products, technologies and solutions by end customers and key influencers, including municipal representatives, engineering firms, designers and other system specifiers.  Our performance depends, in part, on our ability to attract,

incentivize and retain third-party sales representatives that will be able to market and support our products effectively, and competition for sales personnel with established customer relationships is intense.

* * *

*Operational investment*. Our historical operating results reflect the impact of our ongoing investments to support our growth. We have made significant investments in our business that we believe have laid the foundation for continued profitable growth. We believe that our strengthened sales force, mergers and acquisitions team, enhanced information systems, research, development and engineering investments and other factors enable us to support our operating model.

147. These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays.

148. The IPO Prospectus also outlined the following hypothetical risk factors concerning Evoqua's sales and other key personnel:

*Failure to retain our existing senior management, skilled technical, engineering, sales and other key personnel or the inability to attract and retain new qualified personnel could materially adversely impact our ability to operate or grow our business*.

Our success depends to a significant extent on our ability to retain or attract a significant number of employees in senior management, skilled technical, engineering, sales and other key personnel. Since the AEA Acquisition, we have focused on creating a high performance culture, in which our employees are highly enabled, empowered and accountable. Our inability to continue to develop and maintain our culture by empowering our senior management, other leaders and employees and promoting an entrepreneurial spirit, could result in

- 55 -

our loss of key leaders and employees and have a material adverse effect on our business, financial condition, results of operations or prospects.

Effective succession planning is also important to our long-term success, as a failure to ensure effective transfer of knowledge and smooth transitions involving key employees could hinder our strategic planning and execution. We have implemented a voluntary separation program intended to mitigate the risks associated with knowledge transfer, but we cannot guarantee that it will be effective or cost-efficient.

We will need to continue to develop a roster of qualified talent to support business growth. Without a sufficient number of skilled employees, our operations and manufacturing quality could suffer. Our experienced sales team has also developed a number of meaningful customer relationships that would be difficult to replace. Therefore, competition for qualified technical personnel and for sales personnel with established customer relationships is intense, both in retaining our existing employees and in replacing or finding additional suitable employees. There can be no assurance that the labor pool from which we hire our personnel will increase or remain stable, and any failure to retain our existing technical and sales personnel and other employees or to attract additional skilled personnel could have a material adverse effect our business, financial condition, results of operations or prospects.

149. These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays. Thus, the aforementioned risks described in the IPO Prospectus, were not simply hypothetical possibilities; but rather, were actualized risks that were negatively impacting the Company's business and financial results.

150. The IPO Prospectus presented the Company's revenue, net income, adjusted EBITDA, and expenses in, the IPO Prospectus Summary, under "Company Overview," and

elsewhere in the IPO Prospectus, including in Unaudited Pro Forma Financial Information, Selected Historical Consolidated Financial Data, and Management's Discussion and Analysis of Financial Condition and Results of Operations. The IPO Prospectus reported, *inter alia*, that:

> For the fiscal year ended September 30, 2016, we generated revenue, net income and Adjusted EBITDA of $1.1 billion, $13.0 million and $160.1 million, respectively. For the fiscal year ended September 30, 2016, we generated pro forma revenue, pro forma net income and Adjusted EBITDA (pro forma as adjusted for contributions from insignificant completed acquisitions) of $1.2 billion, $16.8 million and $182.4 million, respectively.

151.    These statements were materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to potential investors, the Defendants utilized improper accounting tricks to artificially and materially exaggerate Evoqua's reported revenues, income, and EBITDA in violation of GAAP. As detailed above, the accounting misconduct involved improperly recognizing revenue, prematurely or otherwise, and understating expenses. In addition to these practices, the Company was involved in other questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

152.    The IPO Prospectus also reported certain severance related costs as "[r]estructuring and related business transformation costs" including the following:

> $16.9 million in fiscal 2016 . . . , a range of $19.8 million to $20.2 million in fiscal 2017, $16.9 million for the three months ended September 30, 2016 and a range of $0.9 million to $1.0 million in the three months ended September 30, 2017 related to our voluntary separation plan pursuant to which approximately 220 employees accepted separation packages . . . .

153.    However, in truth, through a widespread termination program, the Company had actually pushed out its experienced and qualified sales and integration personnel through a variety of tactics, not limited to the purported VSP. The IPO Prospectus did not disclose that the Company also replaced its experienced staff, if at all, with inexperienced employees who lacked

adequate knowledge to perform their responsibilities and failed to account for the droves of employees who left or were removed from the Company against their own accord. As such, this statement was materially false and misleading.

### December 1, 2017 Earnings Call, Presentation, and Press Release

154.    On December 1, 2017, the Company hosted an earnings call for investors to discuss the fourth quarter and year end results for the fiscal year ended September 30, 2017. During the call, Defendant Keating explained that Evoqua had "aligned our RD&E spend to the highest market priorities and established a team delivering systematic M&A that augments our R&D and organic growth."

155.    Defendant Keating also touted the Company's pre-IPO acquisitions, stating in relevant part:

> We utilize M&A to fill gaps in our product portfolio to penetrate vertical market segments or to expand our geographic reach.  Our transactions have been accretive in year one, and we are very pleased with the performance of our last eight acquisitions.  Overall, we are agnostic between M&A and R&D for new product development, and we believe there is a large pipeline of outstanding opportunities at attractive multiples.

> *        *        *

> In fact, what we do with the M&A is we really have it as a part of our strategic plan.  We identify the targets around the areas I spoke around with product gaps, product portfolio gaps, vertical market extensions, and then geographic extension.

156.    Defendant Stas similarly touted the purported success of the Company's pre-IPO acquisitions and integration capabilities  during the call, stating that:

> [W]e are agnostic between RD&E product launches versus doing a small tuck-in acquisition, so they kind of behave the same way, and we look at them the same way in our mindset.  But what typically happens is when we do the acquisition, the acquisition grows faster because it's pulling through sales from the organic business.  And the organic area grows faster because it has a new product launch or a new capability within the portfolio.  And we integrate them relatively fast.

So, trying to keep specific core business separate from the tuck-in acquisition becomes difficult after a few months.

157. These statements were materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized improper accounting tricks to exaggerate Evoqua's reported revenues, income, and EBITDA artificially and materially, in violation of GAAP. As detailed above, the accounting misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise, and understating expenses. In addition to these practices, the Company was involved in other questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

158. Defendant Stas also reported the Company's purported revenue and adjusted EBITDA growth during the call, stating in relevant part:

> For the fourth quarter, reported revenues were up approximately 12% to $360 million. Pro forma revenues, normalizing for acquisitions in all periods, were up 8% driven by strong growth in the Industrial and Products segments. Foreign exchange increased revenues by approximately $1.8 million. Adjusted EBITDA margins grew 140 basis points to 20% of sales for the quarter driven by leverage on sales volume, growth as well as operational cost efficiencies.

159. These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays.

160.    The same day, the Company filed a current report on Form 8-K with the SEC, and attached a press release and presentation slides used during the earnings call as exhibits. The presentation contained false and misleading statements about Evoqua's acquisitions. For instance, the presentation set forth the Company's supposed "[c]ontinued profitable growth through R&D and M&A" which involved its [e]stablished strategy to fill gaps through M&A . . . [o]pportunistic approach to sourcing new technology and products between R&D and M&A" and "[d]eep reservoir of new technologies driving growth today."

161.    The presentation also highlighted Evoqua's purported financial results, stating in relevant part:

**Fourth Quarter 2017**[6]

- **Revenue growth of 11.6%**

    o **8.4% pro forma growth[]**

- **Adjusted EBITDA margin of 20.0%**

**Full Year 2017**

- **Revenue growth of 9.7%**

    o **4.4% pro forma growth[]**

- **Adjusted EBITDA up 29.7%**

    o **Primary drivers: organic revenue, operational efficiencies and acquisitions**

- **Acquired four tuck-in businesses**

---

[6]    Emphasis in original.

162.    The presentation also reported revenue of $356.5 million, compared to $319.4 million year-over-year, net income of $13.0 million, up $12.8 million year-over-year, and adjusted EBITDA of $71.4 million, up 20.1% year-over-year for the fourth quarter 2017 results. For the full year 2017 results, the presentation reported, revenues of $1.25 billion, a 9.7% increase year-over-year, net income of $6.4 million, a decline of $6.6 million year-over-year, and adjusted EBITDA of $207.7 million, up 29.7% year-over- year.

163.    These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays.

164.    The accompanying press release, also issued by the Company on December 1, 2017, reiterated the financial results displayed in the presentation, and stated in relevant part:

Evoqua reported revenues for the fourth quarter of 2017 of $356.5 million, an 11.6% increase as compared to the fourth quarter of the prior year. Net income for the quarter was $13.0 million, up $12.8 million year-over-year. The Company delivered Adjusted EBITDA of $71.4 million in the fourth quarter 2017, an increase of 20.1% year-over-year.

For the full year fiscal 2017, Evoqua reported revenues of $1.25 billion, a 9.7% increase year-over-year. Net income for the year was $6.4 million and the Company delivered Adjusted EBITDA of $207.7 million for the full year fiscal 2017, a 29.7% increase over the prior year.

"For both the quarter and full-year Evoqua employees generated record sales, net income and Adjusted EBITDA by focusing on our 38,000 customers across the

world," said Ron Keating, Evoqua CEO. "Following our successful initial public offering on November 2, we are well positioned to continue to capture organic and inorganic growth opportunities as we leverage our iconic brands and differentiated technologies to capitalize on favorable industry dynamics, and further strengthen our number one market position in North America."

165.    These statements were materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized improper accounting tricks to exaggerate Evoqua's reported revenues, income, and EBITDA artificially and materially, in violation of GAAP. As detailed above, the accounting misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise, and understating expenses.  In addition to these practices, the Company was involved in other questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.  They also failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays.

### December 4, 2017 Form 10-K

166.    On December 4, 2017, the Company filed its annual report with the SEC for the fiscal year ended September 30, 2017 on Form 10-K (the "2017 10-K"), which was signed by Defendants Keating, Stas, Lamb, Bhambri, Cappeline, Gregg, Hoesterey, and Kumar. The 2017 10-K, stated the following about Evoqua's  acquisitions:

. . . As a complement to our organic growth initiatives, we view tuck-in acquisitions as a key element of our overall growth strategy . . . . To capitalize on these opportunities we have built an experienced team dedicated to mergers and acquisitions that has successfully completed eight technology-enhancing and geography-expanding acquisitions since April 2016, including the addition of capabilities in the attractive aquatics market[.]

\*       \*       \*

**Research, Development and Engineering**

We utilize a disciplined, stage-gate process – consisting of development, field test, commercialization, supply chain and sourcing decisions – to identify and develop new technologies to commercialize, focus our efforts on and engage early with supply-chain management to promote profitability. We focus on tuck-in acquisitions as additional resources for new product innovation and development.

\*       \*       \*

**Acquisitions**

We believe that tuck-in acquisitions present a key opportunity within our overall growth strategy, which we will continue to evaluate strategically. . . . To capitalize on these opportunities, we have built an experienced team dedicated to mergers and acquisitions that has successfully completed eight technology-enhancing and geography-expanding acquisitions since April 2016, with purchase prices ranging from approximately $3.3 million to approximately $283.7 million, and pre-acquisition revenues ranging from approximately $3.1 million to approximately $55.7 million. . . . [A]lthough we may not be able to continue to identify suitable acquisition targets and implement our growth strategy, we currently have a pipeline which includes more than 60 potential targets, which has been developed proactively by our team as well as informed by our customer base.

167.    These statements were materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized improper accounting tricks to exaggerate Evoqua's reported revenues, income, and EBITDA artificially and materially, in violation of GAAP. As detailed above, the accounting misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise, and understating expenses. In addition to these practices, the Company was involved in other

questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

168.    The 2017 10-K also presented  the Company's financial results for the 2017 fiscal year, compared to 2016 as follows: "[f]or the fiscal year ended September 30, 2017, we generated revenue, net income and Adjusted EBITDA of $1.2 billion, $6.4 million and $207.7 million, respectively.  For the fiscal year ended September 30, 2016, we generated revenue, net income and Adjusted EBITDA of $1.1 billion, $13.0 million and $160.1 million, respectively."

169.    These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays.

170.    The 2017 Form 10-K also provided hypothetical risk factors pertaining to its acquisition efforts and sales personnel (as well as other key personnel), that were substantially identical to those in the IPO Prospectus.

171.    The purported risk factors  concerning the Company's acquisitions and Evoqua's personnel were materially false or misleading for the same reasons as those outlined *supra* for the IPO Prospectus.

172.    Attached to the 2017 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by

Defendants Keating and Stas, attesting to the accuracy of the 2017 10-K, maintaining that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that Defendants Keating and Stas were "responsible for establishing and maintaining disclosure controls and procedures." The 2017 10-K also disclosed that Defendants Keating and Stas had concluded that Evoqua's disclosure controls were effective.

173.    These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays. These statements were also materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized improper accounting tricks to exaggerate Evoqua's reported revenues, income, and EBITDA artificially and materially, in violation of GAAP. As detailed above, the accounting misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise, and understating expenses.  In addition to these practices, the Company was involved in other questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

*February 6, 2018 Earnings Call, Presentation, and Press Release*

174.     On February 6, 2018, the Company hosted an earnings call to discuss Evoqua's financial results for the first quarter ended December 31, 2017.   During the call, Defendant Keating emphasized Evoqua's purported acquisition related performance, stating in relevant part:

> *We aligned our RD&E spend to the highest market priorities and we established a systematic and targeted approach to M&A that augments our R&D and organic growth*.  As you can see, the business has responded well, delivering solid and improving year-over-year sales and profitability results.
>
> \*       \*       \*
>
> . . . Our industry is very fragmented.  And while we're  the industry leader, we have just 11% market share.  We utilize M&A to fill gaps in our product portfolio to penetrate desirable vertical market segments and to expand our geographic reach. *Our transactions have been accretive in year one and we're very pleased with the performance of our acquisitions.*
>
> Overall, we're agnostic between M&A and R&D for new product development, and we believe that there is a very large pipeline of outstanding opportunities at attractive multiples.
>
> \*       \*       \*
>
> As recently announced, we completed the acquisition of Pure Water Solutions on January 31.  Pure Water is a strong ultrapure regional player with a service footprint across Colorado and New Mexico. The company is focused on the pharmaceutical and laboratory, medical, commercial, industrial, and agricultural vertical markets. This geographic tuck-in transaction marks the ninth acquisition since April of 2016.  As communicated in our strategy, we're focused on tuck-in organic-like-inorganic growth by expanding our service footprint and product offerings through acquisition.  Pure Water Solutions is yet another example of this successful strategy.
>
> \*       \*       \*
>
> Overall profitability showed expected improvement over the prior year as acquisitions, lower costs, and mix were strong contributing factors.

175.     Defendant Keating's statements were materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized improper accounting tricks to exaggerate Evoqua's reported revenues, income,

and EBITDA artificially and materially, in violation of GAAP. As detailed above, the accounting misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise, and understating expenses. In addition to these practices, the Company was involved in other questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

176.    During the call, Defendant Stas further touted the positive impact Evoqua's acquisitions had on its EBITDA, stating that "[a]djusted EBITDA grew 7% versus the prior year and margins continued to expand. This was driven by operational cost efficiencies and synergies from acquired companies offsetting negative year-over-year timing related mix impacts." Defendant Stas also reported EBITDA growth in Evoqua's Industrial segment, by "over 25% and margins expanded to 24% of sales, a 230 basis points improvement over the prior year. EBITDA improvement was driven by volume leverage, cost initiatives and acquisition synergies."

177.    According to Defendant Stas on the call, revenue and adjusted EBITDA were the Company's primary financial metrics and provided a foundation for the Company's financial forecast:

> As we enter our first year as a public company, revenue growth and adjusted EBITDA will be our primary financial metrics. We are reaffirming our outlook. We expect total reported revenues to be in the range of $1.33 billion to $1.36 billion, representing growth of approximately 7% to 9%. Adjusted EBITDA is expected to be in the range of $235 million to $255 million, representing growth of approximately 13% to 23%.

178.    As with Defendant Keating's representations, these statements were materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized improper accounting tricks to exaggerate Evoqua's reported revenues, income, and EBITDA artificially and materially, in violation of

GAAP. As detailed above, the accounting misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise, and understating expenses. In addition to these practices, the Company was involved in other questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

179. The same day, on February 6, 2018, the Company filed a current report on Form 8-K with the SEC and attached a press release and presentation slides used during the earnings call as exhibits. The investor presentation reported first quarter 2018 revenue of $297.1 million (up 6.1% year-over year) and adjusted EBITDA of $40 million (up 7.4% year-over-year) and maintained that the financial results were positively impacted by Evoqua's acquisitions, with "[r]evenue growth of 6.1%" 4.8% of which was "from tuck-in acquisitions" and "[a]djusted EBITDA growth of 7.4%, resulting in part from "[a]ccretive impact of acquisitions[.]" The presentation slides also provided purported "[c]ontinued profitable growth through R&D and M&A" including through "[d]evelop[ing] and commercializ[ing] new technologies [an] [e]stablished strategy to fill gaps through M&A[,]" Evoqua's "[o]pportunistic approach to R&D and M&A [and] [d]eep M&A pipeline."

180. These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product

and service delays. These statements were also materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized improper accounting tricks to exaggerate Evoqua's reported revenues, income, and EBITDA artificially and materially, in violation of GAAP. As detailed above, the accounting misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise, and understating expenses.  In addition to these practices, the Company was involved in other questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

181.    The accompanying press release issued by the Company the same day, also announced Evoqua's first quarter financial results, stating in relevant part:

> Evoqua reported revenues for the first quarter of fiscal 2018 of $297.1 million, an increase of $17.2 million or 6.1% as compared to the first quarter of the prior year. Revenue growth was driven by an increase in organic service revenues in the Industrial segment associated with account penetration in the power, hydrocarbon processing and chemical processing markets and from recently acquired businesses.  Net loss for the quarter was $3.0 million, an improvement of $10.2 million or 77.2% year-over-year.  Adjusted EBITDA was $40.0 million in the first quarter of fiscal 2018, an increase of $2.7 million or 7.4% year-over-year.  The improvement in Adjusted EBITDA was driven by an increase in revenues and related gross margin as well as a decrease in operating expenses year-over-year.

> "For the first quarter, Evoqua generated record sales and Adjusted EBITDA led by strong growth in the Industrial segment, complemented by the realization of continued operational efficiency benefits," said Ron Keating, Evoqua CEO. "Fiscal 2018 is off to a strong start.  We continue to be well positioned to capture organic and inorganic growth opportunities across our business segments."

182.    These statements were materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized improper accounting tricks to exaggerate Evoqua's reported revenues, income, and EBITDA artificially and materially, in violation of GAAP. As detailed above, the accounting

misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise, and understating expenses. In addition to these practices, the Company was involved in other questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

### *February 7, 2018 Form 10-Q*

183.     On February 7, 2018, the Company filed its quarterly report with the SEC for the first quarterly period ended December 31, 2018 on a Form 10-Q (the "1Q18 10-Q"), which was signed by Defendants Keating and Stas.

184.     The 1Q18 10-Q touched on the Company's cost-cutting efforts under a heading titled "Operational Excellence" stating that "[w]e believe that continuous improvement of our operations, processes and organizational structure is a key driver of our earnings growth. Since fiscal 2014, we have realigned our organizational structure, achieved significant cost savings through operational efficiencies and revitalized our culture, which has energized our workforce and reduced employee turnover."

185.     These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays.

186.    The 1Q18 10-Q maintained that "[t]here have been no material changes to the information concerning risk factors as stated in [the 2017 10-K]." As outlined above, those risk factors were materially false and misleading.

187.    Additionally, the 1Q18 10-Q also reported the Company's financial results, and the Company's purported revenue and adjusted EBITDA growth, stating in relevant part:

> Revenues increased $17,179, or 6.1%, to $297,051 in the three months ended December 31, 2017 from $279,872 in the three months ended December 31, 2016.
>
> \*        \*        \*
>
> Revenues from product sales increased $7,363, or 4.5%, to $169,658 in the three months ended December 31, 2017 from $162,295 in the three months ended December 31, 2016.  The increase in product revenues was primarily due to the acquisitions of ETS, ADI and Olson, which accounted for $10,167 in revenues.
>
> \*        \*        \*
>
> Adjusted EBITDA increased $2,742, or 7.4%, to $39,981 for the three months ended December 31, 2017 from $37,239 for the three months ended December 31, 2016.  Benefits derived from restructuring and operational efficiencies that were implemented in the current and prior fiscal year, as well as increased volume and accretive profitability associated with organic revenue growth and prior year acquisitions, provided for the increase in Adjusted EBITDA, offset somewhat by the timing variances in operating profit in the Municipal and Products segments.

188.    These statements were materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized improper accounting tricks to exaggerate Evoqua's reported revenues, income, and EBITDA artificially and materially, in violation of GAAP. As detailed above, the accounting misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise, and understating expenses.  In addition to these practices, the Company was involved

in other questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

189. Attached to the 1Q18 10-Q were SOX certifications signed by Defendants Keating and Stas attesting to the accuracy of the 1Q18 10-Q and maintaining that Defendants Keating and Stas had evaluated the Company's disclosure controls and procedures and determined that they were effective for the quarterly period. These attestations were false and misleading for the same reasons outlined *supra* discussing the 2017 10-K.

### February 22, 2018 Presentation at Gabelli & Company's 28th Annual Pump, Valve, and Water Systems Symposium

190. On February 22, 2018, Defendants Keating and Stas made a presentation on behalf of the Company to analysts and investors at the Gabelli & Company's 28th Annual Pump, Valve, and Water Systems Symposium. The slides accompanying the Defendants' presentations reiterated the Company's "M&A–Supplementing long-term organic growth" through "Continued profitable growth through R&D and M&A." The presentation further touted Evoqua's aim to "[d]evelop and commercialize new technologies" and presented its "[e]stablished strategy to fill gaps through M&A . . . . [o]pportunistic approach to R&D and M&A [and] [d]eep M&A pipeline."

191. These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the

Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays.

192.    The slides further presented the Company's financial results for the first quarter of 2018,  including revenue of $297.1 million (up 6.1% year-over-year) and adjusted EBITDA of $40 million (up 7.4% year-over-year) and maintained that the Company's financial performance was positively impacted by its acquisitions:  "4.8% [of 6.1% revenue growth] from tuck-in acquisitions" and "[a]ccretive impact of acquisitions [on increased adjusted EBITDA]."

193.    These statements were materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized improper accounting tricks to exaggerate Evoqua's reported revenues, income, and EBITDA artificially and materially, in violation of GAAP. As detailed above, the accounting misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise, and understating expenses.  In addition to these practices, the Company was involved in other questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

### *February 28, 2018 Investor & Analyst Event*

194.    On February 28, 2018, Defendant Keating and Stas presented at an Investor and Analyst Event hosted that day at Evoqua's world headquarters in Pittsburgh, Pennsylvania. The Company also filed a current report with the SEC on Form 8-K the same day, attaching the presentation slides for the event as an exhibit. The presentation slides utilized by Defendant Keating during his presentation highlighted Evoqua's "Value-enhancing investments internally and through M&A" and emphasized the Company's "Built out dedicated M&A team and standardized execution."  The presentation slides communicated that "M&A is a key, low risk

strategy for growth that leverages existing capacity and market channels." As part of "Evoqua's Multi-Pronged Growth Strategy," the slides stated that the Company's "Product, Technology & Acquisitions" would "[d]rive [Evoqua's] acquisition strategy and complement internal RD&E[.]"

195. These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays.

196. During the investor and analyst event, Defendant Stas's presentation slides highlighted the Company's financial results, including the Company's first quarter 2018 revenues of $297.1 million (up 6.1% year-over-year) and adjusted EBITDA of $40 million (up 7.4% year-over-year) and maintained that the financial results were positively impacted by Evoqua's acquisitions, including, "4.8% [of 6.1% revenue growth] from tuck-in acquisitions" and "[a]ccretive impact of acquisitions [on increased adjusted EBITDA]."

197. These statements were materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized improper accounting tricks to exaggerate Evoqua's reported revenues, income, and EBITDA artificially and materially, in violation of GAAP. As detailed above, the accounting misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise, and understating expenses. In addition to these practices, the Company was involved

in other questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

### March 14, 2018 SPO Documents

198.    On March 14, 2018, the Company's SPO Registration Statement, dated March 12, 2018, was declared effective. The SPO Registration Statement contained the same misrepresentations discussed below that were included in the SPO Prospectus.

199.    The SPO Registration Statement also reported the Company's financial results, including that "[f]or the fiscal year ended September 30, 2017, we generated revenue, net income and Adjusted EBITDA of $1.2 billion, $6.4 million and $207.7 million, respectively."

200.    On March 16, 2018, the Company filed its SPO Prospectus, dated March 14, 2018. The SPO Prospectus contained virtually identical representations as the IPO Prospectus regarding Evoqua's purported leadership team, stating that the Company's strengths included its "[e]xperienced management team with proven operational capabilities that has made Evoqua an employer of choice." As outlined above with respect to the IPO Prospectus, these statements remained materially false or misleading.

201.    With respect to Evoqua's purported growth strategy, the SPO Prospectus stated:

*Commercialize and drive adoption of nascent and newly acquired technologies by leveraging our sales channels and application expertise*. We offer a full range of services, systems and technologies that we continually develop to meet our customers' evolving water lifecycle needs.  We develop our technologies through in-house research, development and engineering and targeted tuck-in, technology- enhancing and geography-expanding acquisitions and have a reservoir of recently launched technologies and a pipeline of new offerings designed to provide customers with innovative, value-enhancing solutions. *Furthermore, we have successfully completed ten technology-enhancing and geography-expanding acquisitions since April 2016 to add new capabilities and cross-selling opportunities in areas such as electrochemical and electrochlorination cells, regenerative media filtration, anodes, UV and ozone disinfection and aerobic and anaerobic biological treatment technologies*.  We must continue to develop and acquire new products, services and solutions to

successfully compete in our markets.

We believe a key differentiator for our technology development program is our strong record of incorporating new technologies into the comprehensive solutions we provide to our customers across our platform. We are able to rapidly scale new technologies using our leading direct and third-party sales channels and our relationships with key influencers, including municipal representatives, engineering firms, designers and other system specifiers. Through our service network, we have a direct view of our customers' water needs which allows us to focus on developing and acquiring the most relevant and sought-after solutions.

*We believe our continued investment in driving penetration of our recently launched technologies, robust pipeline of new capabilities and best-in-class channels to market will allow us to continue to address our customer needs across the water lifecycle.*

202.    These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays.

203.    Like the IPO Prospectus, the SPO Prospectus essentially provided the same hypothetical "Risks Associated with Our Business" concerning Evoqua's acquisitions, integration efforts, and workforce retention and were thus materially false and misleading for the same reasons outlined *supra*. Specifically, the SPO Prospectus stated, in relevant part:

[o]ur growth strategy includes acquisitions, and we may not be able to identify suitable acquisition targets or otherwise successfully implement our growth strategy;

[w]e may have difficulty in operating or integrating any acquired businesses, assets or product lines profitably or in otherwise successfully implementing our growth strategy"; [and]

* * *

**_Failure to retain our existing senior management, skilled technical, engineering, sales and other key personnel or the inability to attract and retain new qualified personnel could materially adversely impact our ability to operate or grow our business._**[7]

204.    The SPO Documents also incorporated by reference the 2017 10-K, 1Q18 10-Q, and the Form 8-Ks dated December 20, 2017, January 9, 2018, and March 12, 2018, and thus, also incorporated the false or misleading statements discussed in those materials identified herein.

205.    These statements were materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized improper accounting tricks to exaggerate Evoqua's reported revenues, income, and EBITDA artificially and materially, in violation of GAAP. As detailed above, the accounting misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise, and understating expenses.  In addition to these practices, the Company was involved in other questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

206.    The SPO Documents also reported severance related costs that Evoqua incurred in "[r]estructuring and related business transformation costs" including:

$16.9 million in fiscal 2016 . . . , $20.1 million in fiscal 2017 . . . related to our voluntary separation plan pursuant to which approximately 220 employees accepted separation packages, $10.2 million for the three months ended December 31, 2016 and $0.4 million for the three months ended December 31, 2017[.]

---

[7]     Emphasis in original.

207.    This statement was materially false or misleading because in truth, through the widespread termination program, the Company had actually pushed out its experienced and qualified sales and integration personnel through a variety of tactics, not limited to the purported VSP. The SPO Documents did not disclose that the Company also replaced its experienced staff, if at all, with inexperienced employees who lacked adequate knowledge to perform their responsibilities and failed to account for the droves of employees who left or were removed from the Company against their own accord.

### **The Truth Begins to Emerge as False and Misleading Statements Continue**

#### ***May 8, 2018 Press Release, Earnings Call, and Form 10-Q***

208.    On May 8, 2018, the Company issued a press release, also attached to a current report filed with the SEC on Form 8-K the same day, announcing its second quarter 2018 results. The press release reported purported revenue and adjusted EBITDA growth, stating in relevant part:

> Revenues for the second quarter of fiscal 2018 were $333.7 million, an increase of $33.8 million or 11.3% as compared to the second quarter of the prior year. Revenue growth was led by increases in the Industrial segment related to capital projects in the power market, remediation projects and revenues from recently acquired businesses.  Additionally, the Products segment contributed to year-over- year growth through volume increases across multiple divisions.

> Net income for the quarter was $13.0 million, an improvement of $8.1 million or 165.2% year-over-year. Diluted EPS for the quarter was $0.10 per share on 119.2 million weighted average shares outstanding.

> Adjusted EBITDA was $57.7 million in the second quarter of fiscal 2018, an increase of $13.8 million or 31.3% year-over-year.  The improvement in Adjusted EBITDA was driven by the increase in revenues and related profit as well as a decrease in operating expenses year-over-year.

209.    These statements were materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized

improper accounting tricks to exaggerate Evoqua's reported revenues, income, and EBITDA artificially and materially, in violation of GAAP. As detailed above, the accounting misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise, and understating expenses. In addition to these practices, the Company was involved in other questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

210. The same day, on May 8, 2018, the Company hosted an earnings call for investors to discuss Evoqua's financial results for the quarter ended March 31, 2018. During the call, Defendant Keating touted the Company's purported successful acquisitions and integration efforts:

> We utilize M&A to fill gaps in our product portfolio, to penetrate desirable vertical market segments or to expand our geographic reach. ***Our transactions have been accretive in year one and we're very pleased with the performance of our acquisitions. We believe tuck-in acquisitions are low risk by nature and we expect to seamlessly integrate the businesses into our organization***.

> Overall, we're agnostic between M&A and R&D for new product development and we believe there is a larger pipeline of outstanding opportunities at attractive multiples.

> *      *      *

> As recently announced, we completed the acquisition of Pacific Ozone in March. We are very pleased to have Pacific as a part of the Evoqua family. Pacific Ozone is a manufacturer of high end integrated ozone systems, targeting multiple industrial markets, including bottled water, beverage, food processing and industrial process water applications. The addition of Pacific filled the portfolio gap and brings with it over 5,000 installations in more than 30 countries. The Pacific leadership team will join the Evoqua team to help us build a larger and more global ozone disinfection business . . . .

211. These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in

turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays.

212.    Also during the call, Defendant Keating maintained that Evoqua's acquisitions positively impacted the Company's financial performance:

> We're very pleased with our second quarter results.  Revenue growth for the quarter was up double digits, primarily driven by growth from our Industrial and Products segment s and acquired companies.  We were very pleased that all three segments reported double-digit year-over-year EBITDA growth for the quarter. Our growth and profitability initiatives are in place and we're making solid progress in each segment.  We believe we're taking market share and delivering compelling solutions to our customers.  We are pleased with the performance through the first half of the year and we are very well positioned to see continued profitable growth organically and through M&A for the full-year.

213.    These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays. These statements were also materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized improper accounting tricks to exaggerate Evoqua's reported revenues, income, and EBITDA artificially and materially, in violation of GAAP. As detailed above, the accounting

misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise, and understating expenses. In addition to these practices, the Company was involved in other questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

214.　During the same earnings call, Defendant Stas stated:

For the second quarter, reported revenues were up over 11% to $334 million, pro forma revenues normalizing for acquisitions were up almost 7%, driven by growth in the Industrial and Products segment and acquisitions contributed more than 4%.

*　　*　　*

Second quarter adjusted EBITDA grew by approximately 31% versus the prior year to $58 million, 17.3% of sales, a 270 basis point expansion in EBITDA margins.

*　　*　　*

For the third quarter, we expect adjusted EBITDA to grow in the range of approximately 5% to 10% over the prior year. For the full-year, we expect total reported revenues to be in the range of $1.34 billion to $1.37 billion, an increase of $10 million to the high end and the low ends of the original range and representing growth of approximately 7% to 10% over the prior year.

Adjusted EBITDA is now expected to be in the range of $235 million to $245 million, a $10 million reduction to the high end of the previous range.

215.　These statements were materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized improper accounting tricks to exaggerate Evoqua's reported revenues, income, and EBITDA artificially and materially, in violation of GAAP. As detailed above, the accounting misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise, and understating expenses. In addition to these practices, the Company was involved in other

questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

216.    Also during the call, Defendant Stas responded to an analyst's question on whether acquired businesses had higher margins than Evoqua's legacy businesses, by emphasizing once again the Company's purported success in integrating its acquisitions:

> We got to remember those acquired businesses also include some synergies as well that's helping those margins. Again, these are good businesses. And we're also seeing some cross-selling of those businesses. Some of these projects that we are winning that Ron talked about earlier across divisional selling is directly a result of the acquisitions where we are now having a more comprehensive solution in the marketplace. So all of this leads to good news for the future, but again, the acquired businesses are nice businesses that have been accretive.

217.    These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays.

218.    Also on May 8, 2018, the Company filed its quarterly report with the SEC for the second quarterly period ended March 31, 2018 (the "2Q18 10-Q"), which was signed by Defendants Keating and Stas.

219.    The 2Q18 10-Q identified the Company's purported "Organic Growth Drivers[,]" which included, "Product and Technology Development." In describing that particular driver, the 2Q18 10-Q stated in relevant part:

We develop our technologies through in-house research, development and engineering and targeted tuck-in, technology-enhancing and geography-expanding acquisitions. We have a reservoir of recently launched technologies and a strong pipeline of new offerings designed to provide customers with innovative, value-enhancing solutions. ***Furthermore, we have successfully completed ten technology-enhancing and geography-expanding acquisitions since April 2016 to add new capabilities and cross selling opportunities in areas such as electrochemical and electrochlorination cells, regenerative media filtration, anodes, UV disinfection and aerobic and anaerobic biological treatment technologies***. We are able to rapidly scale new technologies using our leading direct and third-party sales channels and our relationships with key influencers, including municipal representatives, engineering firms, designers and other system specifiers. ***We believe our continued investment in driving penetration of our recently launched technologies, robust pipeline of new capabilities and best-in-class channels to market will allow us to continue to address our customer needs across the water lifecycle***.

220. Another purported driver of Evoqua's organic growth outlined in the 2Q18 10-Q was "Operational Excellence[,]" under which the 2Q18 10-Q provided in relevant part, "[w]e believe that continuous improvement of our operations, processes and organizational structure is a key driver of our earnings growth. Since fiscal 2014, we have realigned our organizational structure, achieved significant cost savings through operational efficiencies and revitalized our culture, which has energized our workforce and reduced employee turnover."

221. These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays.

222.    The 2Q18 10-Q also maintained that "[t]here have been no material changes to the information concerning risk factors as stated in our [2017 10-K]." These "risk factors" remained materially false or misleading for the reasons discussed *supra*.

223.    The 2Q18 10-Q also provided the Company's financial results for the quarter and year-over-year comparisons, including Evoqua's purported increased revenues and adjusted EBITDA, stating in relevant part:

> Revenues increased $33,789, or 11.3%, to $333,690 in the three months ended March 31, 2018 from $299,901 in the three months ended March 31, 2017. Revenues increased $50,967, or 8.8%, to $630,740 in the six months ended March 31, 2018 from $579,773 in the six months ended March 31, 2017.
>
> *       *       *
>
> Revenues from product sales increased $31,759, or 19.9%, to $191,701 in the three months ended March 31, 2018 from $159,942 in the three months ended March 31, 2017.  The increase in product revenues was primarily due to the growth in capital projects of $14,393 year-over-year in addition to revenue from the acquisitions of Noble, ADI, Olson, Pure Water and Pacific Ozone, which accounted for $10,238 of increased revenues.  Aftermarket and other component product sales also had organic revenue growth of $3,319.  The remaining increase of $3,809 was due to gains from foreign currency translation.
>
> Revenues from product sales increased $43,433, or 14.2%, to $349,724 in the six months ended March 31, 2018 from $306,291 in the six months ended March 31, 2017. The increase in product revenues was primarily due to the acquisitions of Noble, ADI, Olson, Pure Water and Pacific Ozone, which accounted for $19,121 of the growth in revenues year-over-year. Growth in capital projects resulted in an increase of $11,577 and aftermarket and other component product sales had organic growth of $6,888.  The remaining increase of $5,847 was due to gains from foreign currency translation.
>
> Revenues from services increased $2,030, or 1.5%, to $141,989 in the three months ended March 31, 2018 from $139,959 in the three months ended March 31, 2017. The main driver of this increase was the timing of the delivery of services as compared to the prior year.  The remaining increase was due to $486 recognized from the Noble and Pure Water acquisitions.
>
> Revenues from services increased $7,534, or 2.8%, to $281,016 in the six months ended March 31, 2018 from $273,482 in the six months ended March 31, 2017. The increase was driven mainly by organic revenue growth, including volume

driven increases in Industrial service revenue of approximately $6,378 associated with account penetration in the power, hydrocarbon processing and chemical processing markets. Another $922 was recognized from the Noble and Pure Water acquisitions. The remaining $234 was the result of timing of delivery of services in the current period as compared to the prior period.

*     *     *

Adjusted EBITDA increased $13,771, or 31.3%, to $57,700 for the three months ended March 31, 2018 from $43,929 for the three months ended March 31, 2017. Adjusted EBITDA increased $16,510, or 20.3%, to $97,681 for the six months ended March 31, 2018 from $81,171 for the six months ended March 31, 2017. Benefits derived from restructuring and operational efficiencies that were implemented in the current and prior fiscal year, as well as increased volume and accretive profitability associated with organic revenue growth and current and prior year acquisitions, provided for the increase in Adjusted EBITDA.

224.     These statements were materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized improper accounting tricks to exaggerate Evoqua's reported revenues, income, and EBITDA artificially and materially, in violation of GAAP. As detailed above, the accounting misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise, and understating expenses.  In addition to these practices, the Company was involved in other questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

225.     Attached to the 2Q18 10-Q were SOX certifications signed by Defendants Keating and Stas attesting to the accuracy of the 2Q18 10-Q and maintaining that Defendants Keating and Stas had evaluated the Company's disclosure controls and procedures and determined that they were effective for the quarterly period. These attestations were false and misleading for the same reasons outlined *supra* discussing the 2017 10-K.

226.     After months of successfully disguising the true state of Evoqua's business and operations, the Defendants' ruse slowly began to reveal itself. While the inflated financial results

reported for the second quarter of 2018 in the May 8, 2018 disclosure still met market estimates, the disclosures also revealed, in part, the negative ramifications of the concealed termination policies that had been implemented at the Company and the extensive channel stuffing. In its presentation materials provided to investors during the aforementioned earnings call, the Company announced reduced guidance for its EBITDA for the fiscal year ending September 30, 2018. Specifically, Defendants were forced to reduce previously guidance for the year by approximately $10 million, from $235 million—$255 million to $235 million—$245 million, which was 5% below the market's previous expectations.

227.    On this news, the Company's stock price fell 8.4%, from closing at $20.21 per share on May 7, 2018, to close at $18.51 on May 8, 2018 on unusually heavy trading volumes. However, the Company's shares remained artificially inflated as Defendants' misrepresentations regarding Evoqua's purportedly successful integration efforts and financial performance continued.

### *June 4, 2018 Investor & Analyst Event*

228.    On June 4, 2018, the Company hosted another Investor & Analyst Event in Tewksbury, New Jersey. During the event, Defendant Keating presented with slides depicting the Company's revenues from the fiscal year ended September 30, 2017 of $1.247 billion and adjusted EBITDA of $208 million.

229.    These statements were materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized improper accounting tricks to exaggerate Evoqua's reported revenues, income, and EBITDA artificially and materially, in violation of GAAP. As detailed above, the accounting misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise,

and understating expenses. In addition to these practices, the Company was involved in other questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

230. Defendant Keating's presentation slides further maintained that "Evoqua's multi-pronged growth levers" included its product, technology, and acquisitions which "Drive *acquisition strategy* and complement internal RD&E . . . technologies, markets, geographies"; and stated that one of Evoqua's "Competitive differentiators" was that it was the "Preferred acquisition partner"; and that its "Internal capabilities enabling profitable growth" included "Acquisition process and integration" and "Cross selling strategy[.]"

231. These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays.

### August 7, 2018 Earnings Call, Form 8-K, and Form 10-Q

232. On August 7, 2018, the Company hosted an earnings call for investors to discuss Evoqua's third quarter results for the quarter ended June 30, 2018. During the call, Defendant Keating represented the Company's purported acquisition success and the benefits achieved thereby, stating in relevant part:

> We've seen the industrial wastewater market emerging, and we have taken actions to leverage our capabilities and products internally as well as through our

acquisition strategy, enhancing our market-leading position.

*     *     *

***We continue to invest in our Products segment, both organically and through M&A to broaden and enhance our portfolio of solutions***.  Our 2016 Neptune Benson platform acquisition positioned us solidly in the aquatics market.  This acquisition was followed by five additional tuck-in acquisitions that fill product portfolio gaps within our Products segment and broadened our capabilities to penetrate other industrial markets.  Overall we're largely agnostic between R&D and M&A as we refine and enhance our technology capabilities.

*     *     *

Overall third quarter revenues were up double digits which follows a double-digit growth in the second quarter. Revenue growth was balanced between pro forma organic growth and acquisitions. Overall, adjusted EBITDA was up more than 5% versus last year's third quarter.

*  *  *

Since 2016, we've generated a compound annual growth rate of almost 10% for total sales with product sales growing more than 15% and service sales growth over 3%.  Product sales have exhibited strong growth as we've positioned the company to capture industrial wastewater share, have increased our emphasis in our Products segment sales strategies and included our expanded portfolio from our acquisitions.

*     *     *

We utilize M&A to fill gaps in our product portfolio to penetrate desirable vertical market segments or to expand our geographic reach.  We believe tuck-in acquisitions are low risk and capital efficient by nature and we are successfully integrating these businesses into our organization.  We floated the ProAct Services acquisition, on July 26 and are very pleased to welcome the ProAct employees into the Evoqua family.  ProAct's March 2018, trailing 12 months sales of approximately $54 million and EBITDA of approximately $12 million will be a strong addition to Evoqua and to our Industrial segment.

*     *     *

Since 2016, we have completed 11 acquisitions.  We have used these transactions to fill portfolio, vertical market or geographic gaps in our Industrial and Products segments.  These transactions have accelerated our penetration into new and existing markets while expanding our suite of customer offerings and enhancing our capital growth rate reflected in our results.  We will see the same follow-on

- 88 -

service and aftermarket growth from these acquisitions that we also experienced in the traditional Evoqua business. Overall, we are agnostic between M&A and R&D for new product development, and we believe that there's a very large pipeline of outstanding opportunities at attractive multiples. . . . Going forward, acquisition candidates continue to be mined through multiple channels, and we believe that we have become the acquirer of choice.

233.    These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays. These statements were also materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized improper accounting tricks to exaggerate Evoqua's reported revenues, income, and EBITDA artificially and materially, in violation of GAAP. As detailed above, the accounting misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise, and understating expenses. In addition to these practices, the Company was involved in other questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

234.    Defendant Stas also spoke about the Company's financial results during the call, stating in relevant part that, "For the third quarter, reported revenues increased approximately 10% to $343 Million. . . . Third quarter adjusted EBITDA grew by 5.2% versus the prior year to $58 million or 16.9% of sales. . . . Adjusted EBITDA [in the Industrial segment] grew 11% to

over $38 million, driven by volume increases and acquisitions which offset negative price cost impacts . . . ."

235.    These statements were materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized improper accounting tricks to exaggerate Evoqua's reported revenues, income, and EBITDA artificially and materially, in violation of GAAP. As detailed above, the accounting misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise, and understating expenses.  In addition to these practices, the Company was involved in other questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

236.    The same day, on August 7, 2018, the Company filed a current report on a Form 8-K, attaching a press release and presentation slides for the earnings call as exhibits. The presentation slides attached to the Form 8-K reported increased revenue for the third quarter of 2018, in the amount of $342.5 million, up 10.1% year-over-year, 5.2% of which was "from tuck-in acquisitions," and increased adjusted EBITDA of $58 million, up 5.2% year-over-year due in part to "Accretive impact of acquisitions."

237.    These statements were materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized improper accounting tricks to exaggerate Evoqua's reported revenues, income, and EBITDA artificially and materially, in violation of GAAP. As detailed above, the accounting misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise, and understating expenses.  In addition to these practices, the Company was involved in other

questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

238.     The presentation slides for the third quarter 2018 financial results further stated that among the "Key themes coming out of Q3," were "Enhancing product offering portfolio and vertical market penetration through M&A and RD&E" and "Filling out product portfolio gaps, targeted vertical market offerings and geographic expansion via M&A along with hig [sic] ROI capital expenditures and working capital investments."  Moreover, the presentation slides stated that among the Company's "Key investment highlights" was its "Proven organic and inorganic growth platform."

239.     These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays.

240.     Also on August 7, 2018, the Company filed its quarterly report with the SEC for the third quarterly period ended June 30, 2018 on a Form 10-Q ("the "3Q18 10-Q"), which was signed by Defendants Keating and Stas.

241.     The 3Q18 10-Q contained substantially the same statements as those under the headings "Product and Technology Development" and "Operational Excellence" included in the 2Q18 10-Q outlined above.

242.    These statements were materially false and misleading, as they failed to disclose the widespread systematic reorganization program put in place prior to the IPO, which led to the retirement or other removal of Evoqua's most experienced sales and integration personnel. This in turn inhibited the Company from successfully managing, growing, and integrating its acquired businesses and further dampened the Company's capacity to sustain current revenues and long-term growth. Moreover, the lack of appropriately qualified staff adversely impacted the Company's businesses and customer relations, by, *inter alia*, contributing to significant product and service delays.

243.    The 3Q18 10-Q also maintained that "[t]here have been no material changes to the information concerning risk factors as stated in our [2017 10-K]." These "risk factors" remained materially false or misleading for the reasons discussed *supra*.

244.    The 3Q18 Form 10-Q also reported the Company's financial results, including purported year-over-year increases in the Company's revenues and adjusted EBITDA, stating in relevant part:

> Revenues increased $31,333, or 10.1%, to $342,475 in the three months ended June 30, 2018 from $311,142 in the three months ended June 30, 2017.  Revenues increased $82,299, or 9.2%, to $973,215 in the nine months ended June 30, 2018 from $890,916 in the nine months ended June 30, 2017.

> \*       \*       \*

> Revenues from product sales increased $32,226, or 19.2%, to $200,478 in the three months ended June 30, 2018 from $168,252 in the three months ended June 30, 2017. The increase in product revenues was primarily due to the growth in capital projects of $13,837 year-over-year in addition to revenue from the acquisitions of Noble, ADI, Olson, Pure Water and Pacific Ozone, which accounted for $12,842 of increased revenues. . . .

> Revenues from product sales increased $75,659, or 15.9%, to $550,202 in the nine months ended June 30, 2018 from $474,543 in the nine months ended June 30, 2017. The increase in product revenues was primarily due to growth in capital projects which resulted in an increase of $31,743. The acquisitions of Noble, ADI,

Olson, Pure Water and Pacific Ozone accounted for another $31,774 of the growth in revenues year-over-year. . . .

Revenues from services increased $893, or 0.6%, to $141,997 in the three months ended June 30, 2018 from $142,890 in the three months ended June 30, 2017. The main driver of this increase was $753 recognized from the Noble and Pure Water acquisitions in addition to the timing of the delivery of services as compared to the prior year.

Revenues from services increased $6,640, or 1.6%, to $423,013 in the nine months ended June 30, 2018 from $416,373 in the nine months ended June 30, 2017. The increase was driven mainly by timing of delivery of services in the current period as compared to the prior period. Another $1,842 was recognized from the Noble and Pure Water acquisitions.

*       *       *

Adjusted EBITDA increased $2,882, or 5.2%, to $58,013 for the three months ended June 30, 2018 from $55,131 for the three months ended June 30, 2017. Adjusted EBITDA increased $19,378, or 14.2%, to $155,681 for the nine months ended June 30, 2018 from $136,303 for the nine months ended June 30, 2017. Benefits derived from restructuring and operational efficiencies that were implemented in the current and prior fiscal year, as well as increased volume and accretive profitability associated with organic revenue growth and current and prior year acquisitions, provided for the increase in Adjusted EBITDA.

245.    These statements were materially false and misleading because they failed to reflect the true state of the Company's financial health. Unbeknownst to investors, the Defendants utilized improper accounting tricks to exaggerate Evoqua's reported revenues, income, and EBITDA artificially and materially, in violation of GAAP. As detailed above, the accounting misconduct involved, among other misconduct, improperly recognizing revenue, prematurely or otherwise, and understating expenses. In addition to these practices, the Company was involved in other questionable and undisclosed conduct, such as "channel stuffing" which effectively disguised the extent to which the Company was struggling to generate organic growth.

246.    Attached to the 3Q18 10-Q were SOX certifications signed by Defendants Keating and Stas attesting to the accuracy of the 3Q18 10-Q and maintaining that Defendants Keating and

Stas had evaluated the Company's disclosure controls and procedures and determined that they were effective for the quarterly period. These attestations were false and misleading for the same reasons outlined *supra* discussing the 2017 10-K.

247. The revenues and adjusted EBITDA reported by the Company on August 7, 2018 fell short of market expectations and were on the lower end of the Company's guidance. Although Evoqua did not adjust its guidance further in these disclosures, analysts were picking up on the downward trend. RBC Capital Markets commented that "this is the company's second consecutive quarterly earnings disappointment since its Nov-2017 IPO," and J.P. Morgan stated that "we would expect the stock to underperform today given the 3Q miss and back-end loaded guide, with annual FCF seemingly tracking well below our prior expectations."

248. On this news, the Company's stock price fell 8.8%, from closing at $22.22 per share on August 6, 2018, to close at $20.27 on August 7, 2018, and continued to decline to a close of $17.61 on August 9, 2018, representing a 19% decrease over three days. However, the Company's shares remained artificially inflated as the investing public remained unaware of the truth. In fact, RBC Capital reported that on August 8, 2018 the Company's "reaffirmed 2018 revenue and adjusted EBITDA guidance ranges suggest that the company is confident" that it "can recoup the entirety of the F3Q18 . . . shortfall before year-end.."

**The Truth Emerges**

249. Finally, on October 30, 2018, the Company issued a press release, attached as an exhibit to a Form 8-K filed the same day, announcing disappointing preliminary financial results for the fourth quarter and year ended September 20, 2018. The press release recognized that the preliminary results fell below the Company's and analysts' expectations. The Company also lowered its financial projections for the year and revealed to investors that the Company now

expected revenues to fall between $1.33 billion to $1.34 billion, versus the previously issued range of $1.34 billion to $1.37 billion. The Company also expected lowered its full-year adjusted EBITDA expectations to $213 million to $217 million, versus the previously issued range of $235 million to $245 million.

250.    The Company further acknowledged that the losses were primarily concentrated in the Product segment's aquatics business and the Municipal segment and substantially caused by "acquisition system integration issues," "supply-chain disruptions" (which Evoqua said were "influenced by tariffs"), and "an extended delay on a large aquatics project."

251.    The Company would later disclose that issues with integrating the Neptune-Benson acquisition attracted to the Company's losses due to the disposal of inventory resulting from the migration of Neptune-Benson to a new accounting system. The migration to the new system revealed the significant accounting issues that were plaguing Neptune-Benson, which had not been fully integrated into the rest of Evoqua for more than two years after its acquisition.

252.    The press release also announced that the Company would be transitioning from a three-segment structure to a two-segment operating model designed to better serve the needs of its customers worldwide. The new structure merged the Municipal services business with the existing Industrial segment into a new segment renamed Integrated Solutions and Services. The new consolidated segment would be devoted to engaging directly with end-users. The Products segment and Municipal products businesses were also combined into a new segment, renamed Applied Product Technologies, which would be focused on developing product platforms for sales through third-party channels.

253.    The disappointing preliminary results concerned analysts who downgraded the Company and expressed their surprise at such a significant miss, which reflected poorly on the

credibility of management, and the Company's ability to integrate future acquisitions. To illustrate, Berenberg Capital Markets reported on October 31, 2018, as follows:

> Pre-announcement shocks investors: AQUA negatively pre-announced its Q4 18 EBITDA ~27% below consensus estimates and announced a restructuring yesterday. The EBITDA shortfall was related to acquisition integration issues, supply chain disruptions influenced by tariffs, and a delay on a large aquatics project. *The magnitude of the miss shocked investors and caused the stock to sell off ~35%* (vs. the S&P 500 +1.57%). *The Q4 18 preannouncement is on the heels of a weak Q3 18 report, which further brings credibility into question*.

254. The same day, analysts at Cowen, issued a report titled, "Downgrade: Boulevard of Broken Dreams," and downgraded Evoqua, stating that "[w]hile we see value in the business plan—rolling up a fragmented process water treatment market—execution remains an issue and *investor trust has eroded materially*. It will likely take time to regain and it is incumbent on management to prove that consistent revenue and profitability growth can be achieved." Cowen further expressed that "*[b]roader issues surrounding M&A integration are the most concerning given that consistent acquisition is a core tenant of the company's operating plan*." Analysts at J.P. Morgan also reported on Evoqua's shocking disclosure on October 31, 2018, stating that the disappointing preliminary results were "*surprising in magnitude*."

255. The next day, on November 1, 2018, analysts were still reporting on the Company's significant miss, with Berenberg Capital Markets stating in a report titled "Credibility Issues to Weigh; Reiterate Hold," that:

> [a]n EBITDA miss of 27% shows quite a *magnitude of disconnect* between Street expectations and management's ability to deliver. While some factors impacting Q418 may have been uncontrollable (*i.e.*, a customer delaying a sale), others are within control (i.e., acquisition integration). *AQUA's business is clearly riskier than initially thought*, which should be reflected in its valuation.

256. On this news, Evoqua's stock price plunged $4.78 per share, or 34.64%, on heavy trading volume, from closing at $13.80 per share on October 29, 2018 to close at $9.02 per share

on October 30, 2018. In a single day, $544 million of Evoqua's market capitalization was wiped out.

### Defendants Cause the Company to Violate GAAP through the Aforementioned False and Misleading Statements

#### *Overview of GAAP*

257.    GAAP provides a set of acceptable accounting practices, rules and procedures recognized by the accounting profession at a particular time.  GAAP cites to the SEC Rules and interpretive releases and the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") as authoritative sources concerning SEC registrants.  (ASC 105-10-05-1).  According to Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) financial statements filed with the SEC that are not compliant with GAAP are presumed to be misleading and inaccurate. Interim financial statements are also required under Regulation S-X to comply with GAAP, but interim financial statements need not duplicate disclosures that are made in accompanying annual financial statements.  *See* 17 C.F.R. § 210.10-01(a).

258.    The manner in which Evoqua reported its financial results, position, and operations, materially violated several aspects of GAAP, including the fundamental financial reporting principles and objectives providing that useful financial information should presented to investors or potential investors in financial reports. *See* FASB Statement of Concepts ("CON") No. 8, ¶OB2 ("[t]he objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity.")

259.    Notably, there is no requirement that reporting entities provide investors, lenders, and/or creditors with information. Thus, the financial statements reported by these entities are

increasingly relied upon for providing investors and/or potential investors with crucial information they need to make rational decisions with respect to the reporting entity.

### *Improperly Recognizing Revenues*

260. The Company represented in its financial statements included in the IPO Documents, SPO Documents, 2017 10-K, 1Q18 10-Q, 2Q18 10-Q, and 3Q18 10Q, were all prepared in accordance with GAAP. Most of these filings specifically stated that:

> ***Sales of goods and services are recognized when persuasive evidence of an arrangement exists, the price is fixed or determinable, collectability is reasonably assured and delivery has occurred or services have been rendered***.

> \* \* \*

> For sales of aftermarket parts or products with a low level of customization and engineering time, ***we recognize revenues at the time title and risks and rewards of ownership pass, which is generally when products are shipped or delivered to the customer as we have no obligation for installation***. Sales of short-term service arrangements are recognized as the services are performed, and sales of long-term service arrangements are typically recognized on a straight-line basis over the life of the agreement.

> \* \* \*

> For certain arrangements where there is significant customization to the product, we recognize revenue under the provisions of ASC 605-35, *Revenue Recognition – Construction-Type and Production-Type Contracts*. These products include large capital water treatment projects, systems and solutions for municipal and industrial applications. ***Revenues from construction-type contracts are generally recognized under the percentage-of-completion method, based on the input of costs incurred to date as a percentage of total estimated contract costs***. The nature of the contracts are generally fixed price with milestone billings. Approximately $203.1 million, $218.6 million and $240.2 million of revenues from construction-type contracts were recognized on the percentage-of-completion method during the periods ending September 30, 2015, 2016 and 2017, respectively. Contract revenues and cost estimates are reviewed and revised quarterly at a minimum and the cumulative effect of such adjustments are recognized in current operations. The amounts of such adjustments have not been material.

261.    However, as detailed herein, these representations were materially false and misleading, and were the results of improper accounting manipulations, including but not limited to materially exaggerating Evoqua's reported revenues by prematurely or otherwise improperly recognizing revenues on shipments and/or products and services before those revenues were due.

262.    Pursuant to FASCON No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises* ("FASCON 5"), "guidance for recognition of revenues and gains is intended to provide an acceptable level of assurance of the existence and amounts of revenues and gains before they are recognized[.]" Recognizing revenue requires the consideration of whether/when that the purported revenue or gain is realized or realizable and earned. *See* ¶ 83; ASC 605-10-25(1).

263.    FASCON 5 also provides that "[t]he two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers, and revenues from manufacturing and selling activities and gains and losses from sales of other assets are commonly recognized at time of sale (usually meaning delivery)." Additionally, FASCON 5 states that "[i]f product is contracted for before production, revenues may be recognized by a percentage-of-completion method as earned—as production takes place—provided reasonable estimates of results at completion and reliable measures of progress are available."

264.    ASC 605-15-25(1) also provides that:

If an entity sells the product but gives the buyer a right to return the product, revenue from the sales transaction shall be recognized at the time of the sale only if all of the following conditions are met:

      i.     The seller's price to the buyer is substantially fixed or determinable at the date of sale.

ii.      The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product. If the buyer does not pay at the time of the sale and the buyer's obligation to pay is contractually or implicitly excused until the buyer resells the product, then this condition is not met.

iii.     The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.

iv.      The buyer acquiring the product for resale has economic substance apart from that provided by the seller. This condition relates primarily to buyers that exists on paper, that is, buyers that have little or no physical facilities or employees. It prevents entities from recognizing sales revenue on transactions with parties that the sellers have established primarily for the purpose of recognizing such sales revenue.

v.       The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.

vi.      The amount of future returns can be reasonably estimated (see paragraphs 605-15-25-3 through 25-4). Because detailed record keeping for returns of each product line might be costly in some cases, this Subtopic permits reasonable aggregations and approximations of product returns. As explained in paragraph 605- 15-15-2, exchanges for ultimate customers of one item for another of the same kind, quality, and price, (for example one color or size for another) are not considered returns for purposes of this Subtopic.

vii.     Sales revenue and cost of sales that are not recognized at time of sale because the foregoing conditions are not met shall be recognized either when the return privilege has substantially expired or if those conditions subsequently are met, whichever occurs first.

265.    ASC 605-35-25 further outlines revenue recognition practices for "Construction-Type and Production-Type Contracts" and states that "the basic accounting policy decision is the choice between two generally accepted methods:    the percentage-of-completion method including units of delivery and the completed-contract method." During the Relevant Period, the Company utilized the percentage of completion method.

266.     According to the SEC's "Codification of Staff Accounting Bulletins: Topic 13: Revenue Recognition" ("SAB 13"):

> The staff believes that delivery generally is not considered to have occurred unless the customer has taken title and assumed the risks and rewards of ownership of the products specified in the customer's purchase order or sales agreement. Typically this occurs when a product is delivered to the customer's delivery site (if the terms of the sale are "FOB destination") or when a product is shipped to the customer (if the terms are "FOB shipping point").

267.     Defendants caused the Company to engage in numerous violations of GAAP, as outlined herein, including through offering significant discounts to entice customers to accept products early, even where they had no way to actually take possession of those products. Evoqua would then take the added expense and responsibility of storing the excess inventory at third party storage and recognize revenue once products were delivered to those facilities. This method of recognizing revenue was inappropriate as revenue was recognized before "the risk and rewards of ownership" of the products were realized. There were scores of additional instances where the Company purportedly recognized revenue before that revenue was realized/realizable and earned, such as in cases where revenues were recognized on products before they were shipped or even manufactured yet. Moreover, Evoqua prematurely recognized revenue on service contracts prior to those services being actually rendered, in direct violation of GAAP.

268.     Evoqua also disguised significant weakness in its business through "channel stuffing" and extended payment terms leading up to the IPO in order to boost reported revenues in the short-run at the expense of future bookings and further inflated its reported income by improperly deferring expense payments.

## REPURCHASES DURING THE RELEVANT PERIOD

269.    During the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company.

270.    According to the Company's 2018 10-K filed with the SEC on December 11, 2018, the Company spent an aggregate amount of $250,000 to repurchase 18,000 shares of its own common stock from October 30, 2017 through September 30, 2018.

271.    As the Company stock was actually only worth $9.02 per share, the price at closing on October 30, 2018, the Company overpaid approximately $67,640 in total for these repurchases.

## DAMAGES TO EVOQUA

272.    As a direct and proximate result of the Individual Defendants' conduct, Evoqua will lose and expend many millions of dollars.

273.    Such losses and expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and the Individual Defendants, additional actions brought by former employees of the Company, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

274.    Such losses and expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

275.    Such losses and expenditures include, but are not limited to, the overpayment by $67,640 for repurchases of its own stock during the Relevant Period, when the Company's stock prices was artificially inflated due to the false and misleading statements discussed herein.

276.    As a direct and proximate result of the Individual Defendants' conduct, Evoqua has also suffered and will continue to suffer higher financing costs, a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's

and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

277.    Plaintiff brings this action derivatively and for the benefit of Evoqua to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors and/or officers of Evoqua, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

278.    Evoqua is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

279.    Plaintiff is, and has been at all relevant times, a shareholder of Evoqua.  Plaintiff will adequately and fairly represent the interests of Evoqua in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

280.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

281.    A pre-suit demand on the Board of Evoqua is futile and, therefore, excused.  At the time of filing of this action, the Board consists of Defendants Keating, Lamb, Gregg, Bhambri, Cappeline, Hoesterey, Kumar, and Wilver (the "Director-Defendants") and non-parties Lynn Swann and Lisa Glatch (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors who are on the Board at the time this action is commenced.

282.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme

they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while three of the director-Defendants engaged in insider sales based on non-public information, netting proceeds of over $10 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

283.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the improper accounting scheme and in making and/or causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors.  While investors were duped into believing the fraud perpetrated by the Individual Defendants through their false and misleading statements and omissions, the Individual Defendants caused the Company to repurchase its own stock and four of the Individual Defendants collectively sold over $12.2 million worth of Company stock at artificially inflated prices based on material inside information.  As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

284.   Demand in this case is additionally excused because the Director-Defendants are beholden to and controlled by AEA, who controls the Company by virtue of its share ownership, which provided it and the AEA Affiliates with approximately 58.5% of the Company's common stock prior to the IPO and 70.7% of the voting power over those shares, and approximately 30.9% ownership of the Company's outstating common stock, and approximately 52.5% of the voting power over those shares after the SPO. These shareholdings provided the AEA Defendants with significant control over the continued employment of the Director-Defendants during the Relevant

Period. In fact, according to the 2020 Proxy Statement, up until November 2, 2019, the Company was considered a "controlled company" under NYSE rules. In light of AEA's control, Defendant Keating, whose employment with the Company provides him with his principal source of income, is especially not disinterested. Moreover, several of the Director-Defendants are professionally affiliated with AEA and receive their own principal sources of income from AEA, including Defendants Cappeline, who is an operating partner of AEA, Hoesterey and Kumar, who are partners of AEA, and Lamb, who serves as a member of the European Advisory Board of AEA. The Company recognizes that Defendants Cappeline's, Hoesterey's, and Kuma's affiliates with AEA render them non-independent directors. Thus, the Director-Defendants are unable to evaluate a demand with disinterest or independence as a result of AEA's control over them.

285. Additional reasons that demand on Defendant Keating is futile follow. Defendant Keating has served as the Company's CEO and President, and as a Company director since December 2014, and is thus, as the Company admits, a non-independent director. He has received and continues to receive lavish compensation, as described above. Defendant Keating was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings, press releases, and conferences calls referenced herein, almost all of which he personally made statements in or signed and/or signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the accounting misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded at least $7.2 million in proceeds, demonstrate his motive in facilitating and participating in the

fraud. Moreover, Defendant Keating is a defendant in the Securities Class Action. For these reasons, Defendant Keating breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

286.    Additional reasons that demand on Defendant Lamb is futile follow. Defendant Lamb has served as the Chairman of the Board since 2014 and also served as a member of the Compensation Committee during the Relevant Period. Defendant Lamb has received and continues to receive lavish compensation for his roles within the Company, as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the accounting misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded at least $2.2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. In addition, as mentioned above, Defendant Lamb is affiliated with AEA, through his service on AEA's European Advisory Board. Defendant Lamb signed or authorized the signing of the IPO Registration Statement, the 2017 10-K, and the SPO Registration Statement. Moreover, Defendant Lamb is a defendant in the Securities Class Action. For these reasons, Defendant Lamb breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

287.    Additional reasons that demand on Defendant Gregg is futile follow. Defendant Gregg has served as a Company director since 2014. Defendant Gregg also served as a member of the Nominating and Corporate Governance Committee during the Relevant Period. Defendant Gregg has received and continues to receive lavish compensation for his roles within the Company, as described above. As a trusted Company director, he conducted little, if any, oversight of the

Company's engagement in the accounting misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded at least $600,611 in proceeds, demonstrate his motive in facilitating and participating in the fraud. Defendant Gregg signed or authorized the signing of the IPO Registration Statement, the 2017 10-K, and the SPO Registration Statement. Moreover, Defendant Gregg is a defendant in the Securities Class Action. For these reasons, Defendant Gregg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

288. Additional reasons that demand on Defendant Bhambri is futile follow. Defendant Bhambri has served as a Company director since 2014 and served on the Audit Committee during the Relevant Period. Defendant Bhambri has received and continues to receive lavish compensation for his roles within the Company, as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the accounting misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Bhambri signed or authorized the signing of the IPO Registration Statement, the 2017 10-K, and the SPO Registration Statement. Moreover, Defendant Bhambri is a defendant in the Securities Class Action. For these reasons, Defendant Bhambri breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

289. Additional reasons that demand on Defendant Cappeline is futile follow. Defendant Cappeline has served as a Company director since 2014 and served on all the

Company's Board committees during the Relevant Period, including as the Chairman of the Audit Committee.   Defendant Cappeline has received and continues to receive lavish compensation for his roles within the Company, as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the accounting misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Throughout the Relevant Period, the Board had determined that Defendant Cappeline was not an independent Director, due to his affiliation with AEA. As mentioned above, Defendant Cappeline was, all relevant times, a director of the Company and an Operating Partner of AEA. Defendant Cappeline signed or authorized the signing of the IPO Registration Statement, the 2017 10-K, and the SPO Registration Statement. Moreover, Defendant Cappeline is a defendant in the Securities Class Action.    For these reasons, Defendant Cappeline breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

290.    Additional reasons that demand on Defendant Hoesterey is futile follow. Defendant Hoesterey has served as a Company director since 2014 and also served as a member of the Compensation Committee and Nominating and Corporate Governance Committee during the Relevant Period.   As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the accounting misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Hoesterey is "not independent because of [his] affiliation with AEA" as Partner of AEA. Defendant Hoesterey signed or authorized the signing of the IPO Registration Statement, the

2017 10-K, and the SPO Registration Statement. Moreover, Defendant Hoesterey is a defendant in the Securities Class Action. For these reasons, Defendant Hoesterey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

291.    Additional reasons that demand on Defendant Kumar is futile follow. Defendant Kumar has served as a Company director since 2014. Defendant Kumar also served as a member of the Company's Audit Committee and Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the accounting misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Like Defendant Hoesterey, Defendant Kumar is "not independent because of [his] affiliation with AEA" as Partner of AEA. Defendant Kumar also signed or authorized the signing of the IPO Registration Statement, the 2017 10-K, and the SPO Registration Statement. Moreover, Defendant Kumar is a defendant in the Securities Class Action. For these reasons, Defendant Kumar breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

292.    Additional reasons that demand on Defendant Wilver is futile follow. Defendant Wilver has served as a Company director since 2018. Defendant Wilver has received and continues to receive lavish compensation for his roles within the Company, as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the accounting misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and

consciously disregarded his duties to protect corporate assets. Defendant Wilver signed or authorized the signing of the SPO Registration Statement. Moreover, Defendant Wilver is a defendant in the Securities Class Action. For these reasons, Defendant Wilver breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

293. Additional reasons that demand on the Board is futile follow.

294. The Director-Defendants have longstanding business and personal relationships, and with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. Most of the Director-Defendants have served at the Company together, with certain of the Individual Defendants, since well before Evoqua's IPO. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

295. In violation of the Code of Ethics and Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the accounting misconduct and the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 10(b) and 20(a) of the Exchange Act. In further violation of the Code of Ethics and Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest and unlawful insider trading, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Ethics and Conduct. The

Director-Defendants further approved the sale of Company stock to the investing public at artificially inflated prices in the IPO and/or SPO. No shares were sold by the Company during the SPO, however, AEA's control over the Board enabled it to sell 24% of its holdings in the Company to the investing public in the SPO at artificially inflated prices. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

296. The Director-Defendants also continue to be defendants in the ongoing Securities Class Action where the U.S. District Court for the Southern District of New York recently sustained Securities Act claims against the defendants named therein, including the Director-Defendants, based on allegations regarding materially false and misleading statements and omissions in the IPO and SPO Documents, among others, that are substantially similar to those set forth herein. Accordingly, if the Director Defendants were to pursue these derivative claims, they would undercut or compromise the defense of all defendants in the Securities Class Action, all of whom are also named herein as Defendants. Accordingly, the Director-Defendants are fatally conflicted and, therefore, are unable to render a disinterested decision as to whether the Company should pursue these derivative claims. Demand would thus be futile.

297. Evoqua has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Evoqua any part of the damages Evoqua suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

298. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim

exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

299. The acts complained of herein constitute violations of fiduciary duties owed by Evoqua's controlling shareholder, officers and directors, and these acts are incapable of ratification.

300. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Evoqua. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Evoqua, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

301.     If there is no directors' and officers' liability insurance, then the Directors will not cause Evoqua to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

302.     Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 10(b) of the Securities Exchange Act of 1934

303.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

304.     Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, provides, in relevant part, that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

305.     The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Evoqua. Not only is Evoqua now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Evoqua by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the

Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase approximately its own securities at artificially-inflated prices, damaging Evoqua.

306. The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's public statements.

307. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Evoqua not misleading.

308. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Evoqua.

309. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and

misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

310. By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

311. Plaintiff on behalf of Evoqua has no adequate remedy at law.

## SECOND CLAIM

**Against Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934**

312. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

313. Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, provides, in relevant part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation of cause of action."

314. Defendants, by virtue of their positions with Evoqua and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Evoqua and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. Defendants had the power and influence and exercised the same to cause Evoqua to engage in the illegal conduct and practices complained of herein.

315. In addition, by virtue of its ownership stake and power to appoint three members of the Evoqua Board, AEA had the power to control or influence Evoqua and the particular

transactions giving rise to the securities violations, as alleged herein, and exercised the same. By virtue of its position as a controlling person, AEA is liable pursuant to §20(a) of the Exchange Act.

316.  Plaintiff on behalf of Evoqua has no adequate remedy at law.

## THIRD CLAIM

### Against the Defendants for Breach of Fiduciary Duties

317.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

318.  The AEA Defendants and each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Evoqua's business and affairs.

319.  The AEA Defendants and each of the Individual Defendants violated and breached his/her/its fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

320.  Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Evoqua.

321.  In breach of their fiduciary duties owed to Evoqua, Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that the Company: (i) had privately terminated, and was continuing to privately terminate, its most experienced sales and integration personnel; (ii) was unable to effectively assimilate its prior acquisitions and was experiencing significant and expensive problems with its integration attempts; (iii) failed to maintain adequate internal controls, including by improperly inflating revenue and deflating expenses in violation of

GAAP; (iv) violations of GAAP rules, along with Evoqua's "channel stuffing" activities artificially inflated its reported financial performance and disguised the Company's actual stalled growth; and (v) prioritized short term cost savings by, among other measures, terminating its most experienced sales and integration personnel,  foreseeably placing Evoqua's long-term post-IPO and post-SPO prospects at risk.

322.    Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

323.    Also in breach of their fiduciary duties, the Defendants failed to maintain internal controls.

324.    Furthermore, Defendants  breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations and omissions, and by conspiring with each other and the AEA Defendants in the public offerings of shares in the IPO and SPO, at artificially inflated prices, which caused Evoqua to become liable to outside investors for violations of federal securities laws.

325.    At the same time, Defendants caused Evoqua to lose thousands of dollars repurchasing its own stock at artificially inflated prices. The Company repurchased approximately 18,000 shares of the Company's stock at inflated prices between October 1, 2017 and September 30, 2018 for approximately $230,000.

326.    Additionally, four of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact referenced herein.

327.    Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Evoqua's securities and disguising insider sales.

328.    Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Evoqua's securities and engaging in insider sales.

329.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

330.    As a direct and proximate result of the Defendants' breaches of their fiduciary obligations, Evoqua has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

331.    Plaintiff on behalf of Evoqua has no adequate remedy at law.

## FOURTH CLAIM

### Against Defendants for Unjust Enrichment

332.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

333.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Defendants were unjustly enriched at the expense of, and to the detriment of, Evoqua.

334.    The Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Evoqua that was tied to the performance or artificially inflated valuation of Evoqua, or received compensation that was unjust in light of the Defendants' bad faith conduct.

335.    Plaintiff, as a shareholder and a representative of Evoqua, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

336.    Plaintiff on behalf of Evoqua has no adequate remedy at law.

## FIFTH CLAIM

### Against Defendants for Abuse of Control

337.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

338.    The Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Evoqua, for which they are legally responsible.

339.   As a direct and proximate result of the Defendants' abuse of control, Evoqua has sustained significant damages.   As a direct and proximate result of the Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Evoqua has sustained and continues to sustain significant damages.   As a result of the misconduct alleged herein, the Defendants are liable to the Company.

340.   Plaintiff on behalf of Evoqua has no adequate remedy at law.

## SIXTH CLAIM

### Against Defendants for Gross Mismanagement

341.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

342.   By their actions alleged herein, the Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Evoqua in a manner consistent with the operations of a publicly-held corporation.

343.   As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, Evoqua has sustained and will continue to sustain significant damages.

344.   As a result of the misconduct and breaches of duty alleged herein, the Defendants are liable to the Company.

345.   Plaintiff on behalf of Evoqua has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants for Waste of Corporate Assets

346.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

347.    The Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

348.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Evoqua to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

349.    As a result of the waste of corporate assets, the Defendants are each liable to the Company.

350.    Plaintiff on behalf of Evoqua has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Evoqua, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached their fiduciary duties to Evoqua;

(c)    Determining and awarding to Evoqua the damages sustained by it as a result of the violations set forth above from the AEA Defendants and each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Evoqua and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Evoqua and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.    A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.    A provision to permit the shareholders of Evoqua to nominate at least five candidates for election to the board; and

3.    A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Evoqua restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and

proper.

Dated: July 27, 2020                    Respectfully submitted,

**LAW OFFICE OF LEON AUSSPRUNG, MD, LLC**

*/s/ James E. Hockenberry*
James E. Hockenberry
1429 Walnut Street, Suite 300
Philadelphia, PA  19102
215-717-0744 (p)
888-800-5731 (f)
JH@aussprunglaw.com

**THE BROWN LAW FIRM, P.C.**

Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
516-922-5427 (p)
516-344-6204 (f)
tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Robert Hyams am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of ____7/23/2020____, 2020.

_Robert Hyams_
D10EC494562E405...

Robert Hyams